**Jeri PLATNER, Plaintiff–Appellant,**

v.

**CASH & THOMAS CONTRACTORS, INC., Jack Thomas, and Savonda Thomas, Defendants–Appellees.**

**No. 89–8762.**

United States Court of Appeals, Eleventh Circuit.

Aug. 10, 1990.

Jack P. Batson, Augusta, Ga., for plaintiff-appellant.

Jack L. Cooper, Augusta, Ga., for defendants-appellees.

Before FAY and JOHNSON, Circuit Judges, and GIBSON *, Senior Circuit Judge.

JOHNSON, Circuit Judge:

Plaintiff Jeri Platner appeals from the district court's judgment for defendants Cash & Thomas Contractors, Inc. ("Cash & Thomas"), Jack Thomas ("Thomas"), and Savonda Thomas ("Savonda"), in her sex discrimination suit brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2 (West 1981).[1] The district court issued its findings of fact and conclusions of law orally from the bench at the conclusion of a one-day bench trial on August 22, 1989, and entered judgment on August 23, 1989.

## I. FACTS

Platner worked for Cash & Thomas, a general contracting and pipe-laying firm

---

* Hon. Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. Platner sued Savonda for malicious interference with her employment contract. The district court ruled against Platner on this claim in conjunction with its Title VII ruling. Platner does not contest on appeal the district court's ruling with regard to Savonda.

owned by defendant Jack Thomas, from January 25, 1987 until she was fired on July 21, 1987. She worked primarily as a flag-person on work crews. Thomas's son Steve was employed by Cash & Thomas as a work crew supervisor during this time, and remained so thereafter. Steve and Platner were both based at Cash & Thomas's branch office in Augusta, Georgia, which is the scene of the events underlying the instant case.

Steve married Savonda in 1986. Prior to Platner's employment at Cash & Thomas, Savonda went back to her home town to deliver her first baby, who was born on March 6, 1987, and she returned to Augusta in mid-March. Steve and Savonda lived in an apartment in the building housing the Augusta branch office of Cash & Thomas, and their apartment was adjacent to a recreation room Thomas had set aside for Cash & Thomas employees to relax in after the day's shift. When the baby was three months old, Savonda, who had previously worked full time for Cash & Thomas, began working again part time as a secretary in the office while Steve, Platner, and other employees were out on the work crews. Most afternoons, when the work crews returned, the employees would socialize and drink beer in the recreation room. Platner would usually socialize with the other employees, including Steve, until picked up by her husband around 5:30. Savonda, apparently busy with the baby, rarely if ever socialized with the employees during these times.

The long and the short of this case is that Savonda became extremely jealous of Platner, and began to suspect that Platner and Steve were carrying on an affair. The district court wisely refrained from attempting to reach any definitive factual conclusion as to whether this affair was real or existed only in Savonda's fevered imagination. The court did note, however, in its oral findings of fact, that Savonda "ha[d] a heightened sense of need to protect her marital interest. That is, she [was] unduly jealous." The court found that Steve was largely to blame for fueling Savonda's jealousy, in that he continued to flaunt his socializing even after Savonda's feelings were clear, and responded angrily, and abusively on occasion, to Savonda's accusations. The court found Platner's conduct in socializing with Steve and the other employees, while not entirely "prudent" once it became clear how Savonda felt, to be basically blameless and no different from that of the male employees. The court found, for example, that Platner did not wear clothing inappropriate for her job.[2] Generally speaking, the evidence is that Platner was a satisfactory employee, and Thomas himself appears to concede that her ultimate discharge was not based on any misconduct or shortcomings directly related to her job duties.

The friction between Savonda and Platner, however, and between Savonda and Steve regarding Platner, went from bad to worse. Things reached a fine boil when, after Steve, Platner, and several other employees had driven out one evening to visit a co-worker in the hospital and returned late, Savonda discovered what she believed was a smear of make-up on Steve's shirt-collar. Savonda confronted Platner the next day at a work-site with the allegedly incriminating evidence in hand. In response to this incident, Steve forced Savonda to make a humiliating public apology to Platner. The last straw was apparently

---

**2.** With a notable flair for genteel phraseology, the court stated:

It was brought out in opening statement that [Platner] had on short shorts and the evidence in the case is simply not that. Ms. Platner wore shorts, during periods of warm weather either mid-thigh to knee length shorts, and she has described them as loose and comfortably fit, and that description seems to be uncontroverted. It is apparent that she wore during periods of warmer weather either t-shirts or what I understand to be called tank tops, with appropriate underwear. Whether her bra could be seen through the t-shirt may have depended on the color of the t-shirt or top. It was, according to the evidence in this case, always in place.... I cannot conclude that Ms. Platner wore unduly suggestive clothing. I can conclude and I do conclude that some may have seen her clothing, if not as suggestive, as attractive or perhaps even refreshing. That, of course, would depend on the eye of the beholder. Apparently it was enough somehow to flame Savonda's jealousy.

when Platner announced one day, in front of Savonda, Steve, and several other employees, that she was going to watch some boat-races at the river over the weekend. Savonda accompanied Steve to this event, and was offended by the sight of Platner, clad in a bikini and without her husband present, laughing and socializing with a group of men.[3]

During the course of this domestic brouhaha, Thomas became aware, both directly and through third parties, of the apparently irreconcilable conflict between his daughter-in-law and Platner. While the district court found no evidence that Savonda directly confronted Thomas and demanded Platner's dismissal, the court did find that Thomas "had heard, at least second hand, these statements made by Savonda Thomas that she was ready to leave Steve Thomas and turn him over to Jeri Platner if she wanted him." The court found that Thomas "perceived this as a threat to his son's family unit." The court's ultimate factual conclusion was that:

Jack Thomas dismissed Jeri Platner because of the discord that existed in his family and undoubtedly in his business. There are few things more likely to produce more discord in the workplace than this rumor, suspicion, gossip, and innuendo that was rampant by this time in this small and closely held ... pipeline contracting operation.

Mr. Thomas's motives and intentions were to protect his son, and as I said from himself, if not from the advances of an adventurous woman, to quiet his daughter-in-law, and to preserve whatever he could of a conventional family unit environment for his grandchild.

....

There was no [gender] stereotyping that was borne out by the preponderance of the evidence. There was simply, in the mind of Jack Thomas, a desire to get his business, and to the extent that he could achieve it, his family's equilibrium, back in balance, and he did what he thought to be ... needful and that is that he cast out the offending part by dismissing Ms. Jeri Platner. I see his intent and motivation to be just what he said it was.[4]

## II. ANALYSIS

We find that the above-described factual conclusions of the district court are not clearly erroneous. Indeed, we find the district court's analysis of the facts of this case to be sensitive, balanced, and thoughtful. We find the legal issue raised by this case quite simple. It is whether Thomas's personal, family-related reasons for firing Platner constitute a legitimate, nondiscriminatory basis for that action under Title VII.

■ Platner, who was replaced by a male employee, argues that she was fired due to her involvement, whether real or perceived, in an "office romance," while Steve, similarly situated except for his gender, was exempted from punitive action. Although it is clear that sexual *activity*, rather than sexual identity as such, is not a discriminatory basis for employment action under Title VII, *see DeCintio v. Westchester County Medical Center*, 807 F.2d 304, 306 (2d Cir.1986), *cert. denied*, 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987), an employer may not, simply on grounds of gender, punish the female but not the male participant in a real or suspected inter-employee liaison. *See Shore v. Federal Express Corp.*, 777 F.2d 1155, 1156–57 (6th

---

**3.** Savonda's testimony in this regard is revealing:

SAVONDA: ... [Platner] was down there with that other girl and about eight guys and as best I can remember none was her husband. She was with eight guys and neither one was her husband

MR. COOPER [COUNSEL FOR THE DEFENDANTS]: How was she dressed?

SAVONDA: In a bikini. I had on my bikini too, but I was with my husband.

MR. COOPER: Did that upset you?

SAVONDA: Well, her being dressed like that didn't because I had a bikini on but she wasn't with her husband, but her making plans to be down there knowing my husband was going to be down there.

**4.** Steve and Savonda were divorced on August 1, 1989, because of lingering bitterness over the dispute. Platner is still married.

Cir.1985).[5] While Platner's argument relies on correct principles of law, however, it is inapposite to the facts of this case.

 The district court repeatedly emphasized that the key element in Thomas's motivation was to "protect his son." It is evident that Thomas, faced with a seemingly insoluble conflict within his family, felt he had to make a choice as to which employee to keep. He opted to place the burden of resolving the situation on Platner, to whom he was not related, and whose dismissal would not, as firing Steve obviously would, fracture his family and its relationships. It is thus clear that the ultimate basis for Platner's dismissal was not gender but simply favoritism for a close relative. However unseemly and regrettable nepotism may be as a basis for employment decisions in most contexts,[6] it is clear that nepotism as such does not constitute discrimination under Title VII. As the Fourth Circuit recently observed:

> [Appellant] maintains that a finding that the City's promotion decision may have been influenced by nepotism mandates judgment in his favor on his Title VII disparate treatment claim. While we share his distaste for a decision which appears to have been made for reasons other than merit, we do not believe that Title VII authorizes courts to declare un-

lawful every arbitrary and unfair employment decision. To hold that favoritism toward friends and relatives is *per se* violative of Title VII would be, in effect, to rewrite federal law. The list of impermissible considerations within the context of employment practice is both limited and specific: "race, color, religion, sex or national origin." We are not free to add our own considerations to the list.

. . . .

> In the absence of proof of discriminatory intent ... "nepotism" by itself is not actionable under a disparate treatment analysis. A racially discriminatory motive cannot, as a matter of law, be invariably inferred from favoritism shown on the basis of some family relationship.

*Holder v. City of Raleigh*, 867 F.2d 823, 825–26 (4th Cir.1989); *cf.* 5 U.S.C.A. § 3110 (West 1977 & Supp.1990) (specifically prohibiting nepotism in federal civil service employment); *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir.1986) (Wisdom, J.), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987) ("Personal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a sex discrimination case by accusation.") (footnote omitted).[7]

---

**5.** We note that the mere fact that Thomas may have acted in response to pressure from Savonda would not justify his action if the reason for the firing urged upon him by Savonda were otherwise discriminatory. This is clear from the "customer preference" cases under Title VII. *See, e.g., Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385, 389 (5th Cir.) (Tuttle, J.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971) (rejecting customer preference for female flight attendants as justification for sex discrimination, where discriminatory employment policy was not founded on "business necessity"). An employer may not illegally discriminate simply because some third party urges or pressures him to do so.

**6.** It is far from clear that the instant case, involving a small, closely-held, family-run business, could fairly be described as such a context. Inasmuch as our duty is simply to apply the law, however, we will refrain from making any extraneous value judgments.

**7.** The Fourth Circuit in *Holder* was careful to note that its reasoning was limited to disparate

treatment cases. *See Holder,* 867 F.2d at 826. In a disparate impact case, of course, the apparently nondiscriminatory criterion of nepotism might well serve to mask unequal treatment, often with racial overtones. *See, e.g., Wards Cove Packing Co. v. Atonio,* — U.S. —, 109 S.Ct. 2115, 2120, 104 L.Ed.2d 733 (1989) (listing nepotism among facially neutral subjective employment criteria challenged on disparate-impact grounds in that case); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 349 & n. 32, 97 S.Ct. 1843, 1861 & n. 32, 52 L.Ed.2d 396 (1977) (citing nepotism as an example of an employment practice potentially "fair in form, but discriminatory in operation"); *Local 53, Int'l Ass'n of Heat and Frost Insulators v. Vogler,* 407 F.2d 1047, 1054 (5th Cir.1969) ("While the nepotism requirement is applicable to black and white alike and is not on its face discriminatory, in a completely white union the present effect of its continued application is to forever deny to negroes and Mexican–Americans any real opportunity for membership.") (cited and quoted with approval in *Teamsters,* 431 U.S. at 349 n. 32, 97 S.Ct. at 1861 n. 32).

### III. CONCLUSION

For the foregoing reasons, we conclude that the district court correctly found that Thomas fired Platner for a reason not actionable under Title VII. We therefore AFFIRM the judgment of the district court.

This case, of course, is not only a disparate treatment rather than a disparate impact case, but it involves an allegation of gender rather than racial discrimination. It is difficult to see how nepotism could mask systematic gender discrimination. While a person's relatives will usually be of the same race, men and women will presumably be equally represented both within and without the family.