# IN THE SUPREME COURT OF IOWA

No. 11–1857

Filed July 12, 2013

**MELISSA NELSON,**

   Appellant,

vs.

**JAMES H. KNIGHT DDS, P.C.** and
**JAMES KNIGHT,**

   Appellees.

_____

   Appeal from the Iowa District Court for Webster County, Thomas J.
Bice, Judge.

   A former employee appeals from the district court's grant of
summary judgment to an employer in a sex discrimination case.
**AFFIRMED**.

   Paige E. Fiedler and Emily E. McCarty of Fiedler & Timmer,
P.L.L.C., Urbandale, for appellant.

   Stuart J. Cochrane and James L. Kramer of Johnson, Kramer,
Good, Mulholland, Cochrane & Driscoll, P.L.C., Fort Dodge, for appellees.

**MANSFIELD, Justice**.[1]

Can a male employer terminate a long-time female employee because the employer's wife, due to no fault of the employee, is concerned about the nature of the relationship between the employer and the employee? This is the question we are required to answer today. For the reasons stated herein, we ultimately conclude the conduct does not amount to unlawful sex discrimination in violation of the Iowa Civil Rights Act.

We emphasize the limits of our decision. The employee did not bring a sexual harassment or hostile work environment claim; we are not deciding how such a claim would have been resolved in this or any other case. Also, when an employer takes an adverse employment action against a person or persons because of a gender-specific characteristic, that can violate the civil rights laws. The record in this case, however, does not support such an allegation.

## I. Facts and Procedural Background.

Because this case was decided on summary judgment, we set forth the facts in the light most favorable to the plaintiff, Melissa Nelson.

In 1999, Dr. Knight[2] hired Nelson to work as a dental assistant in his dental office. At that time, Nelson had just received her community college degree and was twenty years old.

Over the next ten-and-a-half years, Nelson worked as a dental assistant for Dr. Knight. Dr. Knight admits that Nelson was a good dental assistant. Nelson in turn acknowledges that Dr. Knight generally

---

[1]By previous order, the petition for rehearing in this case was granted and the original opinion dated December 21, 2012, was withdrawn. This opinion is now substituted.

[2]We will refer to the defendants Dr. James Knight and James H. Knight DDS, P.C. collectively as "Dr. Knight."

treated her with respect, and she believed him to be a person of high integrity.

On several occasions during the last year and a half when Nelson worked in the office, Dr. Knight complained to Nelson that her clothing was too tight and revealing and "distracting." Dr. Knight at times asked Nelson to put on her lab coat. Dr. Knight later testified that he made these statements to Nelson because "I don't think it's good for me to see her wearing things that accentuate her body." Nelson denies that her clothing was tight or in any way inappropriate.[3]

During the last six months or so of Nelson's employment, Dr. Knight and Nelson started texting each other on both work and personal matters outside the workplace. Both parties initiated texting. Neither objected to the other's texting. Both Dr. Knight and Nelson have children, and some of the texts involved updates on the kids' activities and other relatively innocuous matters. Nelson considered Dr. Knight to be a friend and father figure, and she denies that she ever flirted with him or sought an intimate or sexual relationship with him. At the same time, Nelson admits that a coworker was "jealous that we got along." At one point, Nelson texted Dr. Knight that "[t]he only reason I stay is because of you."

Dr. Knight acknowledges he once told Nelson that if she saw his pants bulging, she would know her clothing was too revealing. On another occasion, Dr. Knight texted Nelson saying the shirt she had worn that day was too tight. After Nelson responded that she did not think he was being fair, Dr. Knight replied that it was a good thing Nelson did not

---

[3]Nelson recalls that Dr. Knight said her clothing was too "distracting" and that he "may have" asked her to put on her lab coat. In any event, she testified that she put on a coat whenever Dr. Knight complained to her about her clothing.

wear tight pants too because then he would get it coming and going. Dr. Knight also recalls that after Nelson allegedly made a statement regarding infrequency in her sex life, he responded to her, "[T]hat's like having a Lamborghini in the garage and never driving it." Nelson recalls that Dr. Knight once texted her to ask how often she experienced an orgasm. Nelson did not answer the text. However, Nelson does not remember ever telling Dr. Knight not to text her or telling him that she was offended.

In late 2009, Dr. Knight took his children to Colorado for Christmas vacation. Dr. Knight's wife Jeanne, who was also an employee in the dental practice, stayed home. Jeanne Knight found out that her husband and Nelson were texting each other during that time. When Dr. Knight returned home, Jeanne Knight confronted her husband and demanded that he terminate Nelson's employment. Both of them consulted with the senior pastor of their church, who agreed with the decision.

Jeanne Knight insisted that her husband terminate Nelson because "she was a big threat to our marriage." According to her affidavit and her deposition testimony, she had several complaints about Nelson. These included Nelson's texting with Dr. Knight, Nelson's clothing, Nelson's alleged flirting with Dr. Knight, Nelson's alleged coldness at work toward her (Jeanne Knight), and Nelson's ongoing criticism of another dental assistant. She added that

> [Nelson] liked to hang around after work when it would be just her and [Dr. Knight] there. I thought it was strange that after being at work all day and away from her kids and husband that she would not be anxious to get home like the other [women] in the office.

At the end of the workday on January 4, 2010, Dr. Knight called Nelson into his office. He had arranged for another pastor from the church to be present as an observer. Dr. Knight, reading from a prepared statement, told Nelson he was firing her. The statement said, in part, that their relationship had become a detriment to Dr. Knight's family and that for the best interests of both Dr. Knight and his family and Nelson and her family, the two of them should not work together. Dr. Knight handed Nelson an envelope which contained one month's severance pay. Nelson started crying and said she loved her job.

Nelson's husband Steve phoned Dr. Knight after getting the news of his wife's firing. Dr. Knight initially refused to talk to Steve Nelson, but later called back and invited him to meet at the office later that same evening. Once again, the pastor was present. In the meeting, Dr. Knight told Steve Nelson that Melissa Nelson had not done anything wrong or inappropriate and that she was the best dental assistant he ever had. However, Dr. Knight said he was worried he was getting too personally attached to her. Dr. Knight told Steve Nelson that nothing was going on but that he feared he would try to have an affair with her down the road if he did not fire her.

Dr. Knight replaced Nelson with another female. Historically, all of his dental assistants have been women.

After timely filing a civil rights complaint and getting a "right to sue" letter from the Iowa Civil Rights Commission, Nelson brought this action against Dr. Knight on August 12, 2010. Nelson's one-count petition alleges that Dr. Knight discriminated against her on the basis of sex. Nelson does not contend that her employer committed sexual harassment. *See McElroy v. State*, 637 N.W.2d 488, 499–500 (Iowa 2001) (discussing when sexual harassment amounts to unlawful sex

discrimination and restating the elements of both quid pro quo and hostile work environment sexual harassment). Her argument, rather, is that Dr. Knight terminated her because of her gender and would not have terminated her if she was male.

Dr. Knight moved for summary judgment. After briefing and oral argument, the district court sustained the motion. The court reasoned in part, "Ms. Nelson was fired not because of her gender but because she was a threat to the marriage of Dr. Knight." Nelson appeals.

## II. Standard of Review.

We review the district court's summary judgment ruling for correction of errors at law. *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 802 (Iowa 2003). We view the factual record in the light most favorable to the nonmoving party, affording that party all reasonable inferences. *Id.* Summary judgment is proper only if the record, so viewed, entitles the moving party to judgment as a matter of law. *Id.*

## III. Analysis.

Section 216.6(1)(*a*) of the Iowa Code makes it generally unlawful to discharge or otherwise discriminate against an employee because of the employee's sex. Iowa Code § 216.6(1)(*a*) (2009). "When interpreting discrimination claims under Iowa Code chapter 216, we turn to federal law, including Title VII of the United States Civil Rights Act . . . ." *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 7 (Iowa 2009). Generally, an employer engages in unlawful sex discrimination when the employer takes adverse employment action against an employee and sex is a motivating factor in the employer's decision. *See Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 861 (Iowa 2001).

Nelson argues that her gender was a motivating factor in her termination because she would not have lost her job if she had been a

man. *See, e.g., Watson v. Se. Pa. Transp. Auth.*, 207 F.3d 207, 213, 222 (3d Cir. 2000) (affirming a jury verdict in a Title VII case because the charge, taken as a whole, adequately informed the jury that sex had to be a but-for cause of the adverse employment action). Dr. Knight responds that Nelson was terminated not because of her sex—after all, he only employs women—but because of the nature of their relationship and the perceived threat to Dr. Knight's marriage. Yet Nelson rejoins that neither the relationship nor the alleged threat would have existed if she had not been a woman.

Several cases, including a decision of the United States Court of Appeals for the Eighth Circuit, have found that an employer does not engage in unlawful gender discrimination by discharging a female employee who is involved in a consensual relationship that has triggered personal jealousy. This is true even though the relationship and the resulting jealousy presumably would not have existed if the employee had been male.

*Tenge v. Phillips Modern Ag Co.*, like the present case, centered on a personal relationship between the owner of a small business and a valued employee of the business that was seen by the owner's wife as a threat to their marriage. 446 F.3d 903, 905–06 (8th Cir. 2006). In that case, unlike here, the plaintiff had pinched the owner's rear. *Id.* at 906. She admitted that the owner's wife "could have suspected the two had an intimate relationship." *Id.* Further, the plaintiff acknowledged she wrote "notes of a sexual or intimate nature" to the owner and put them in a location where others could see them. *Id.* In the end, the owner fired the plaintiff, stating that his wife was " 'making me choose between my best employee or her and the kids.' " *Id.*

Reviewing this series of events, the Eighth Circuit affirmed the summary judgment in favor of the defendants. *Id.* at 911. The Eighth Circuit first noted the considerable body of authority that " 'sexual favoritism,' where one employee was treated more favorably than members of the opposite sex because of a consensual relationship with the boss," does not violate Title VII. *Id.* at 908–09. The court distilled that law as follows:

> [T]he principle that emerges from the above cases is that absent claims of coercion or widespread sexual favoritism, where an employee engages in consensual sexual conduct with a supervisor and an employment decision is based on this conduct, Title VII is not implicated because any benefits of the relationship are due to the sexual conduct, rather than the gender, of the employee.

*Id.* at 909.

The Eighth Circuit believed these sexual favoritism precedents were relevant. The court's unstated reasoning was that if a specific instance of sexual *favoritism* does not constitute gender discrimination, treating an employee *unfavorably* because of such a relationship does not violate the law either.

Yet the court acknowledged that cases where the employee was treated less favorably would be "more directly analogous." *Id.* The court then discussed a decision of the Eleventh Circuit where an employee had been terminated for being a perceived threat to the marriage of the owner's son. *Id.* (discussing *Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 903–05 (11th Cir. 1990)). It also cited three federal district court cases, each of which had "concluded that terminating an employee based on the employee's consensual sexual conduct does not violate Title VII absent allegations that the conduct stemmed from unwelcome sexual advances or a hostile work environment." *Id.* (citing

*Kahn v. Objective Solutions, Int'l,* 86 F. Supp. 2d 377, 382 (S.D.N.Y. 2000); *Campbell v. Masten,* 955 F. Supp. 526, 529 (D. Md. 1997); *Freeman v. Cont'l Technical Serv., Inc.,* 710 F. Supp. 328, 331 (N.D. Ga. 1988)).

After reviewing these precedents, the Eighth Circuit found the owner had not violated Title VII in terminating the employee at his wife's behest. As the court explained, "The ultimate basis for Tenge's dismissal was not her sex, it was Scott's desire to allay his wife's concerns over Tenge's admitted sexual behavior with him." *Id.* at 910.

In our case, the district court quoted at length from *Tenge,* stating it found that decision "persuasive." However, Nelson argues there is a significant factual difference between the two cases. As the Eighth Circuit put it, "Tenge was terminated due to the consequences of her own admitted conduct with her employer, not because of her status as a woman." *Id.* The Eighth Circuit added a caveat:

> The question is not before us of whether it would be sex discrimination if Tenge had been terminated because Lori [the owner's wife] perceived her as a threat to her marriage but there was no evidence that she had engaged in any sexually suggestive conduct.

*Id.* at 910 n.5. Nelson contrasts that situation with her own, where she claims she "did not do anything to get herself fired except exist as a female."

So the question we must answer is the one left open in *Tenge*—whether an employee who has not engaged in flirtatious conduct may be lawfully terminated simply because the boss's spouse views the relationship between the boss and the employee as a threat to her marriage. Notwithstanding the Eighth Circuit's care to leave that question unanswered, it seems odd at first glance to have the question of

whether the *employer* engaged in unlawful discrimination turn on the *employee's* conduct, assuming that such conduct (whatever it is) would not typically be a firing offense. Usually our legal focus is on the employer's motivation, not on whether the discharge in a broader sense is fair. Title VII and the Iowa Civil Rights Act are not general fairness laws, and an employer does not violate them by treating an employee unfairly so long as the employer does not engage in discrimination based upon the employee's protected status.

In some respects, the present case resembles *Platner*. There a business owner chose to terminate a female employee who worked on the same crew as the business owner's son, after the wife of the business owner's son became "extremely jealous" of her. *Platner*, 908 F.2d at 903. The district court found that the son was "largely to blame for fueling [the wife's] jealousy," and that the plaintiff's conduct was "basically blameless and no different from that of the male employees." *Id.* Nonetheless, the Eleventh Circuit found no unlawful discrimination had occurred:

> It is evident that Thomas, faced with a seemingly insoluble conflict within his family, felt he had to make a choice as to which employee to keep. He opted to place the burden of resolving the situation on Platner, to whom he was not related, and whose dismissal would not, as firing Steve obviously would, fracture his family and its relationships. It is thus clear that the ultimate basis for Platner's dismissal was not gender but simply favoritism for a close relative.

*Id.* at 905. Significantly, although Dr. Knight discusses *Platner* at some length in his briefing, Nelson does not refer to the decision in her briefing or attempt to distinguish it.[4]

---

[4]When asked about *Platner* at oral argument, Nelson's counsel offered fair criticism of some of the language used in the opinion. *See Platner*, 908 F.2d at 903 n.2.

Our research has found one case, not cited by the parties, where the court arguably found the lack of an actual consensual relationship to be significant. In *Mittl*

Nelson does, however, have three responses to Dr. Knight's overall position.  First, she does not necessarily agree with *Tenge*.  She argues that *any* termination because of a supervisor's interest in an employee amounts to sex discrimination: "Plaintiff's sex is implicated by the very nature of the reason for termination."  Second, she suggests that without some kind of employee misconduct requirement, Dr. Knight's position becomes simply a way of enforcing stereotypes and permitting pretexts: The employer can justify a series of adverse employment actions against persons of one gender by claiming, "My spouse was jealous."  Third, she argues that if Dr. Knight would have been liable to Nelson for sexually harassing her, he should not be able to avoid liability for terminating her out of fear that he was *going to* harass her.

Nelson's arguments warrant serious consideration, but we ultimately think a distinction exists between (1) an isolated employment decision based on personal relations (assuming no coercion or quid pro quo), even if the relations would not have existed if the employee had

_____

*v. New York State Division of Human Rights*, the complaining witness alleged she was unlawfully terminated due to her pregnancy.  794 N.E.2d 660, 662 (N.Y. 2003).  The employer, an ophthalmologist, denied the discrimination and indicated he fired the employee because of the insistence of his wife who "began displaying extreme animosity toward [the employee], even questioning whether [her husband] was the father of the child."  *Mittl v. N.Y. State Div. of Human Rights*, 741 N.Y.S.2d 19, 20 (App. Div. 2002), *rev'd*, 794 N.E.2d 660.  The intermediate appellate court overturned the agency finding of pregnancy discrimination, concluding the employer "was forced to choose between keeping his secretary on the payroll and saving his marriage."  *Id.*  However, the New York Court of Appeals found that substantial evidence supported the agency finding that the employer had discriminated based on pregnancy.  *See Mittl*, 794 N.E.2d at 663.  That court noted, among other things, that the employer had told the complainant her "pregnancy was 'becoming a problem' in the office."  *Id.*  The court added that certain cases cited by the intermediate court were "inapposite" because they involved situations where plaintiffs "were terminated in the aftermath of consensual sexual relationships with their employers" whereas here "neither party alleges that the termination had anything to do with an actual sexual relationship between the parties."  *Id.* at 664.  Notwithstanding this language in the court's opinion, we do not believe *Mittl* ultimately has any bearing on the present case because there was substantial evidence in *Mittl* that the employer had engaged in unlawful, pregnancy-based discrimination, *regardless* of whether a consensual relationship existed.

been of the opposite gender, and (2) a decision based on gender itself. In the former case, the decision is driven entirely by individual feelings and emotions regarding a specific person. Such a decision is not gender-based, nor is it based on factors that might be a proxy for gender.

The civil rights laws seek to insure that employees are treated the same regardless of their sex or other protected status. Yet even taking Nelson's view of the facts, Dr. Knight's unfair decision to terminate Nelson (while paying her a rather ungenerous one month's severance) does not jeopardize that goal. As the *Platner* court observed, " '[W]e do not believe that Title VII authorizes courts to declare unlawful every arbitrary and unfair employment decision.' " *Id.* at 905 (quoting *Holder v. City of Raleigh*, 867 F.2d 823, 825–26 (4th Cir. 1989)).

Nelson's viewpoint would allow any termination decision related to a consensual relationship to be challenged as a discriminatory action because the employee could argue the relationship would not have existed but for her or his gender. This logic would contradict federal caselaw to the effect that adverse employment action stemming from a consensual workplace relationship (absent sexual harassment) is not actionable under Title VII. *See, e.g., Benders v. Bellows & Bellows*, 515 F.3d 757, 768 (7th Cir. 2008) (holding that allegations that an employee's termination was based on the owner's desire to hide a past consensual relationship from his wife were "insufficient to support a cause of action for sex discrimination"); *see also Blackshear v. Interstate Brands Corp.*, No. 10–3696, 2012 WL 3553499, at *3 (6th Cir. 2012) (affirming summary judgment for the employer where the employee presented evidence that she was treated unfairly due to her supervisor's jealousy of her relationship with another employee, and noting that such "personal animus . . . cannot be the basis of a discrimination claim under federal

or Ohio law"); *West v. MCI Worldcom, Inc.*, 205 F. Supp. 2d 531, 544–45 (E.D. Va. 2002) (granting summary judgment to an employer when an employee was removed from a project because of a supervisor's animosity toward the employee over her termination of their consensual relationship but there was no evidence the supervisor had made unwanted advances to the employee following the termination of that relationship).

Nelson raises a legitimate concern about a slippery slope. What if Jeanne Knight demanded that her spouse terminate the employment of *several* women? Of course, a pretext does not prevail in a discrimination case. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2751–52, 125 L. Ed. 2d 407, 421–22 (1993) (discussing how a plaintiff can prove that an employer's reason for a firing was not legitimate, but a pretext for discrimination). If an employer repeatedly took adverse employment actions against persons of a particular gender, that would make it easier to infer that gender and not a relationship was a motivating factor. Here, however, it is not disputed that Jeanne Knight objected to this particular relationship as it had developed after Nelson had already been working at the office for over ten years.

It is likewise true that a decision based on a gender stereotype can amount to unlawful sex discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S. Ct. 1775, 1791, 104 L. Ed. 2d 268, 288 (1989) ("As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for [i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." (Citation

and internal quotation marks omitted.)), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071, 1075–76, *as recognized in Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, ___, ___ S. Ct. ___, ___, ___ L. Ed. 2d ___, ___ (2013); *see also City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707, 98 S. Ct. 1370, 1375, 55 L. Ed. 2d 657, 664–65 (1978) ("It is now well recognized that employment decisions cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or females."); *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) ("Discrimination because one fails to act in the way expected of a man or woman is forbidden under Title VII."). If Nelson could show that she had been terminated because she did not conform to a particular stereotype, this might be a different case. But the record here does not support that conclusion. It is undisputed, rather, that Nelson was fired because Jeanne Knight, unfairly or not, viewed her as a threat to her marriage.[5]

The present case can be contrasted with another recent Eighth Circuit decision. In *Lewis v. Heartland Inns of America, L.L.C.*, a female front desk employee at a hotel claimed she lost her job because she did not have the "Midwestern girl look." 591 F.3d 1033, 1037 (8th Cir. 2010). As the court explained, "The theory of [Lewis's] case is that the

---

[5]As we have noted above, Jeanne Knight said that she thought it was "strange that after being at work all day and away from her kids and husband that [Nelson] would not be anxious to get home like the other [women] in the office." Viewed in isolation, this statement could be an example of a gender-based stereotype. However, as with Jeanne Knight's other comments regarding Nelson, this statement was linked to a specific concern about Nelson's relationship with her husband. This statement immediately followed Jeanne Knight's claim that Nelson "liked to hang around after work when it would be just her and [Dr. Knight] there." Viewing the summary judgment record, we come to the same conclusion as the district court: There is no genuine issue of material fact that the reason for Nelson's firing was Jeanne Knight's demand that she be fired, which was based in turn upon Jeanne Knight's perception that the relationship between Dr. Knight and Nelson was a threat to the marriage.

evidence shows Heartland enforced a de facto requirement that a female employee conform to gender stereotypes in order to work the A shift." *Id.* In fact, the evidence showed that motel management later procured video equipment so they could observe the appearance of front desk applicants prior to hiring. *Id.* at 1042. The Eighth Circuit reversed the district court's grant of summary judgment to the employer and remanded for trial. *Id.* However, the critical difference between *Lewis* and this case is that Nelson indisputably lost her job because Dr. Knight's spouse objected to the parties' *relationship.* In *Lewis*, by contrast, no relationship existed.

Nelson also raises a serious point about sexual harassment. Given that sexual harassment is a violation of antidiscrimination law, Nelson argues that a firing by a boss to *avoid* committing sexual harassment should be treated similarly.[6] But sexual harassment violates our civil rights laws because of the "hostile work environment" or "abusive atmosphere" that it has created for persons of the victim's sex. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 786–90, 118 S. Ct. 2275, 2283–84, 141 L. Ed. 2d 662, 675–78 (1998). On the other hand, an isolated decision to terminate an employee before such an environment arises, even if the reasons for termination are unjust, by definition does not bring about that atmosphere.[7]

As a Michigan appellate court observed regarding a male employee's claim that he had been subjected to sex discrimination:

---

[6]Allegedly, Dr. Knight told Nelson's husband that he "feared that he would try to have an affair with her down the road if he did not fire her."

[7]The record indicates that Dr. Knight made a number of inappropriate comments toward Nelson that are of a type often seen in sexual harassment cases. But as already noted, Nelson does not allege in this case that she was a victim of sexual harassment.

> We do not read the [Michigan Civil Rights Act or CRA] to prohibit conduct based on romantic jealousy. . . . Interpreting the CRA's prohibition of discrimination based on sex to prohibit conduct based on romantic jealousy turns the CRA on its head. The CRA was enacted to prevent discrimination because of classifications specifically enumerated by the Legislature and to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases. It is beyond reason to conclude that plaintiff's status as the romantic competition to the woman Vajda sought to date places plaintiff within the class of individuals the Legislature sought to protect when it prohibited discrimination based on sex under the CRA.

> Plaintiff proceeded to trial on a theory of discrimination based on romantic jealousy. Plaintiff did not claim and the evidence did not establish that plaintiff was required to submit to sexually-based harassment as a condition of employment. Nor did the evidence presented at trial support a theory of gender-based discrimination. Plaintiff established, at most, that Vajda's alleged adverse treatment of plaintiff was based on plaintiff's relationship with Goshorn, not plaintiff's gender. Vajda may have had a romantic purpose in initially pursuing Goshorn and may, as the trial court surmised, have intended to eliminate plaintiff so that he could pursue Goshorn's affections. However, Vajda's alleged harassment was not conduct that is proscribed by the CRA because it was not gender-based. Indeed, if Vajda's motive was to win the affection of Goshorn, it would not matter if the person Vajda perceived to be standing in his way was male or female. As such, it is evident that plaintiff's gender was not the impetus for Vajda's alleged conduct, but rather was merely coincidental to that conduct.

*Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 74 (Mich. Ct. App. 2001) (citations omitted); *see also Huffman v. City of Prairie Vill.*, 980 F. Supp. 1192, 1199 (D. Kan. 1997) ("Plaintiff suggests that the actions taken by Lt. Young as a result of Lt. Young's beliefs concerning plaintiff's relationship with another police officer constitute gender discrimination because such actions would not have been taken against plaintiff but for her gender. We cannot agree with plaintiff's expansive definition of discrimination based upon sex."); *Bush v. Raymond Corp.*, 954 F. Supp. 490, 498 (N.D.N.Y. 1997) ("[P]laintiff's discriminatory discharge claim

fails insofar as it asserts that plaintiff was discharged because of Rusnak's perception that plaintiff and Sawyer had a sexual relationship."). Our decision today is consistent with these authorities.

**IV. Conclusion.**

As we have indicated above, the issue before us is not whether a jury could find that Dr. Knight treated Nelson badly. We are asked to decide only if a genuine fact issue exists as to whether Dr. Knight engaged in unlawful gender discrimination when he fired Nelson at the request of his wife. For the reasons previously discussed, we believe this conduct did not amount to unlawful discrimination, and therefore we affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except Cady, C.J., Wiggins and Hecht, JJ., who concur specially.

**CADY, Chief Justice (concurring specially)**.

I concur in the majority opinion, but write separately to further explain the basis and rationale for the decision. Melissa Nelson set forth a claim for sex discrimination recognized by law, but the facts of the case did not establish the claim.

Our state and federal civil rights laws were enacted to eradicate various forms of discrimination from society. These laws prohibit employment discrimination based on numerous grounds, including discrimination "because of . . . sex." 42 U.S.C. § 2000e-2(*a*)(1) (2006); Iowa Code § 216.6(1)(*a*) (2009). The primary purpose of this law has been to ensure that similarly situated employees are not treated differently because their sex differs. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71, 97 S. Ct. 2264, 2270, 53 L. Ed. 2d 113, 123 (1977).

While the goal behind prohibiting sex discrimination in the workplace is fundamental to a complete society, the task of determining a more precise meaning of sex discrimination has largely been left for the courts. Discrimination is abhorrent to the powerful echoes of the principle of equality that still resonate today from the voices of our forefathers centuries ago, but the struggle to understand and change remains. Yet, as revealed by our history, the process provided by the courts can often be the best environment for those echoes to be heard with greater clarity, aided by the benefit of a greater understanding achieved over the passage of time. A sharper meaning of sex discrimination, however, can be elusive, not only due to constraints on understanding, but also because of the inherent difficulty of fully capturing the intent of the legislature within an environment dominated

by the venerable doctrine of employment at will, which still receives broad support. *See Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 280–82 (Iowa 2000) (reviewing the history of the at-will employment doctrine).

These challenges to defining sex discrimination in the workplace have, at times, created controversy and divisiveness, especially when decisions by courts are not fully explained or when court decisions are not fairly read and interpreted or accepted. The task has also been compounded because the statutory language handed down by the legislature for the courts to interpret and apply in each case could not be more general. This law declares nothing more than workplace discrimination "because of . . . sex" is illegal. *See* Iowa Code § 216.6(1)(*a*). Additionally, although we often presume Title VII and the Iowa Civil Rights Act to have similar scope and meaning, *see Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989), federal courts often declare that Congress provided little legislative history and explanation to guide courts in interpreting the prohibition against discrimination based on "sex." *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63–64, 106 S. Ct. 2399, 2404, 91 L. Ed. 2d 49, 57–58 (1986).[8]

---

[8]Supporters of this view of the legislative history of Title VII often note that the federal legislation passed without any significant debate or explanation to expand on the underlying legislative intent. *See, e.g.*, *Meritor*, 477 U.S. at 63–64, 106 S. Ct. at 2404, 91 L. Ed. 2d at 57–58; *see also* N. Morrison Torrey, *Indirect Discrimination Under Title VII: Expanding Male Standing to Sue for Injuries Received as a Result of Employer Discrimination Against Females*, 64 Wash. L. Rev. 365, 385 (1989) (arguing the amendment to add sex to the list of discriminatory grounds went without challenge and essentially without comment, even though the bill faced months of debate in the Senate). However, there is recent authority suggesting that greater legislative history exists. *See* Robert C. Bird, *More Than a Congressional Joke: A Fresh Look at the Legislative History of Sex Discrimination of the 1964 Civil Rights Act*, 3 Wm. & Mary J. Women & L. 137, 155–60 (1997) (describing the background, history, debate, and voting on the Civil Rights Act); Cary Franklin, *Inventing the "Traditional Concept" of Sex Discrimination*, 125 Harv. L. Rev. 1307, 1326–29 (2012) (highlighting arguments by Representatives Martha Griffiths and Katharine St. George that adding "sex" to the Civil

In the end, of course, the inherent difficulty of defining sex discrimination is understandable because its meaning is often more obvious in principle than when it is applied to a particular factual circumstance. Yet, the accumulation of court cases continues to shape its meaning, all seeking to express the intention of the legislature and to fulfill the purpose of these statutes. Perhaps this approach was the intent of the legislature.

Since the enactment of this nation's civil rights law in 1964, courts have generally interpreted "sex" discrimination in the workplace to mean employment discrimination as a result of a person's gender status. *See, e.g., Smith v. City of Salem,* 378 F.3d 566, 575 (6th Cir. 2004) ("Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination . . . ."). Of the legislative history that is available for courts to use to determine legislative intent, it was mostly clear that gender, not sexual activity, was the sole focus of the legislation. *See* Mitchell Poole, Comment, *Paramours, Promotions, and Sexual Favoritism: Unfair, But Is There Liability?*, 25 Pepp. L. Rev. 819, 846–48 (1998) (noting the historical background). Thus, courts have generally recognized that discrimination exists in the workplace when similarly situated employees are treated differently "because they differ with respect to . . . sex." *Trans World Airlines*, 432 U.S. at 71, 97 S. Ct. at 2270, 53 L. Ed. 2d at 123. More to the point, the differential

Rights Act would ameliorate the unfair labor environment created by so-called "protective" laws, which dated to a period in which women were considered property and severely limited a woman's ability to obtain certain employment); Rachel Osterman, Comment, *Origins of a Myth: Why Courts, Scholars, and the Public Think Title VII's Ban on Sex Discrimination Was an Accident*, 20 Yale J.L. & Feminism 409, 415 (2009) (describing the history of the Civil Rights Act in the Senate after the bill left the House of Representatives). This history could leave room to conclude Title VII was intended to address more than distinctions based on gender as it has been traditionally understood by our courts.

proscribed by the law "must be a distinction based on a person's sex, not on his or her sexual affiliations." *DeCintio v. Westchester Cnty. Med. Ctr.*, 807 F.2d 304, 306–07 (2d Cir. 1986). In other words, differential treatment based on an employee's status as a woman constitutes sex discrimination, while differential treatment on account of conduct resulting from the sexual affiliations of an employee does not form the basis for a sex-discrimination claim. *Id.* at 308 (concluding that prohibiting terminations based on sexual affiliation would distort the meaning of the word "sex" in the context of Title VII and involve the EEOC and federal courts in the policing of personal relationships).

This distinction serves as the foundation of this case and other such cases in which employees suffer adverse employment consequences because they are involved in opposite-sex personal relationships with their employer.[9] The complexity of such cases is not necessarily tied to the complexity of the law as much as the complexity of human relationships and interactions with others. Nevertheless, the law does not escape some blame for the difficult nature of the issue in light of the countervailing employment-at-will doctrine, which permits employers to terminate employees for reasons personal to them, so long as the will of the employer is not discriminatory or otherwise against public policy. *See Fitzgerald*, 613 N.W.2d at 280–82. This law is our Iowa law. *Id.* Thus, while the loss of a job is often devastating to an employee, and at times unfair, these considerations do not play a role under our employment-at-will doctrine, and our exceptions to this law, such as sex discrimination, are only based on the underlying discriminatory

---

[9]In this case, the reference to personal relationships only refers to heterosexual relationships. Both Nelson and Dr. Knight are married to opposite-sex spouses, and this case is evaluated in that context.

motivation of the decision maker. *See Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 762 (Iowa 2009) (noting wrongful-termination claims may not be based "on generalized concepts of socially desirable conduct"). Of course, the unfairness is enhanced for employees when the termination results from a personal relationship with the employer because only the employee suffers the loss of a job, while the other participant in the relationship does not. This result can make acceptance of the law even more difficult.

What has emerged from this complex area of the law is the general legal principle that an adverse employment consequence experienced by an employee because of a voluntary, romantic relationship does not form the basis of a sex-discrimination suit. *See Kahn v. Objective Solutions, Int'l*, 86 F. Supp. 2d 377, 382 (S.D.N.Y. 2000) (collecting cases). Moreover, this general rule is not confined to relationships involving sexual intimacy. The same rule is applied to consensual affiliations involving sexually suggestive conduct. *See Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 910–11 (8th Cir. 2006) (holding no sex discrimination occurred when an employee was fired in a case in which the employee engaged in physical conduct of a suggestive and risqué nature with her employer and wrote sexual or intimate notes to her employer); *Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905 (11th Cir. 1990) (holding no sex discrimination occurred when an employee was fired after engaging in sexually suggestive conduct with her supervisor, who was also the owner's son). When employees are terminated due to consensual, romantic or sexually suggestive relationships with their supervisors, courts generally conclude the reason does not amount to sex discrimination because the adverse employment consequence is based on sexual activity rather than gender.

While courts have been slow to examine the core reasoning for excluding consensual sexual affiliations between employees and employers from the protection of sex-discrimination laws, such an examination offers helpful insight. Close personal relationships between men and woman can often produce personal emotions and conduct that are unfamiliar to the workplace relationship targeted by the general prohibition against gender discrimination in the workplace. *See Keppler v. Hinsdale Twp. High Sch. Dist. 86*, 715 F. Supp. 862, 869 (N.D. Ill. 1989). To be sure, a consensual personal relationship alters the workplace relationship and produces responses and consequences that laws protecting an employee's right to work in an employment environment free from gender discrimination were not intended to protect. *See id.* This observation does not pass judgment on the conduct that defines a personal relationship between an employer and employee, but identifies the practical change in an employment relationship that occurs when a relationship extends beyond the workplace. It also recognizes that the law against workplace discrimination only seeks to protect a woman from discrimination based on her status as a woman in the workplace, not on her consensual sexual relationships or personal affiliations with her employer. *DeCintio*, 807 F.2d at 306–07. The same protection, of course, applies to men. Under this common-sense rationale, a response by the employer to a consensual personal or romantic relationship that becomes a reason for termination is not based on the sex of the employee, but conduct arising from the relationship.[10]

---

[10]However, conduct constituting sexual harassment occurring after the end of a consensual, intimate relationship can violate Title VII and the Iowa Civil Rights Act. *See Johnson v. West*, 218 F.3d 725, 729–30 (7th Cir. 2000); *Walko v. Acad. of Bus. & Career Dev., LLC*, 493 F. Supp. 2d 1042, 1048–49 (N.D. Ill. 2006); *Schrader v. E.G. & G., Inc.*, 953 F. Supp. 1160, 1167–68 (D. Colo. 1997); *Babcock v. Frank*, 729 F. Supp. 279, 288 (S.D.N.Y. 1990); *Williams v. Joe Lowther Ins. Agency, Inc.*, 177 P.3d 1018, 1024–25

No fault or blame for the relationship is considered, only the practical reality of its presence in the workplace as a potential ingredient of adverse employment consequences. *See, e.g.*, *Freeman v. Cont'l Technical Servs., Inc.*, 710 F. Supp. 328, 330–31 (N.D. Ga. 1988).

On the other hand, within the broad spectrum of cases that describe either conduct or gender status lies employer–employee relationships that, even though they are close, produce no suggestion of sexual activity or intimacy to support concluding the termination was grounded on conduct. As with so many legal issues, however, a gray area exists somewhere between these two groups of cases in which the law draws a line based on the individual facts and circumstances of each case.

In this case, Nelson has unmistakably stated a claim protected by our laws against sex discrimination.[11] She asserts that the sexual attraction her employer developed for her, which was the reason for her termination, was his creation and not the result of a personal

_____

(Mont. 2008); *see also Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001).

[11]Nelson actually articulated several specific claims of sex discrimination. She claimed discrimination occurred because she would not have been fired if she had been a man. She also claims she was fired simply for going to work as a woman attractive to her employer. She also claims she was fired due to the discriminatory stereotype that an attractive woman who works with a married man is a threat to the man's marriage. All her arguments, however, collapse into a single claim. For example, Nelson argues she would not have been fired if she were a man; the Knights' marriage would not have been threatened in the same way if she were a (heterosexual) man. As to the discriminatory stereotype that attractive women who work closely with married men are a threat to the man's marriage (derived from Jeanne Knight's demand that Nelson be fired), a threat derived from an actual, ongoing, personal relationship is not a stereotype. *Cf. Staub v. Proctor Hosp.*, 562 U.S. __, ___, 131 S. Ct. 1186, 1193, 179 L. Ed. 2d 144, 154 (2011) (holding that an employer's stated reasons for termination must be separately analyzed to determine whether they were influenced by those of an allegedly biased supervisor). In truth, all the claims asserted by Nelson boil down to whether the relationship engaged in by Nelson and Dr. Knight supplied a nondiscriminatory reason for the termination and eliminated any reasonable inference that gender was the motivating factor.

relationship she maintained with him. Consequently, she maintained she did nothing for the law to now require her to assume responsibility for his attraction to her except exist in the workplace as a woman.

It is abundantly clear that a woman does not lose the protection of our laws prohibiting sex discrimination just because her employer becomes sexually attracted to her, and the employer's attraction then becomes the reason for terminating the woman once it, in some way, becomes a problem for the employer. If a woman is terminated based on stereotypes related to the characteristics of her gender, including attributes of attractiveness, the termination would amount to sex discrimination because the reason for termination would be motivated by the particular gender attribute at issue. *See Smith,* 378 F.3d at 574 (noting an employer who discriminates against women because they do not wear dresses or makeup engages in sex discrimination because the discrimination is due to the gender of the victim); *Gerdom v. Cont'l Airlines, Inc.,* 692 F.2d 602, 608–09 (9th Cir. 1982) (holding a hiring restriction imposing a maximum weight on female flight attendants violated Title VII and noting the restriction "[s]ubsumed . . . the view that, to be attractive, a female may not exceed a fixed weight").

Similarly, implicit in our laws against sex discrimination is that both men and woman are responsible for their own sexual desires and responses to attributes of the sex of the other, and neither sex is responsible to monitor or control the desires of the other sex. Thus, just as an employer cannot fire an employee for not conforming to a sex stereotype embraced by the employer or their customers, an employer cannot legally fire an employee simply because the employer finds the employee too attractive or not attractive enough. *Cf. Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S. Ct. 1775, 1790–91, 104 L. Ed. 2d

268, 287–88 (1989), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071, 1075–76, *as recognized in Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, ___, 133 S. Ct. 2517, 2526, ___ L. Ed. 2d ___, ___ (2013); *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1037 (8th Cir. 2010) (holding an employee suffered sex discrimination when terminated by the employer because he did not feel she had a "Midwestern girl look").

Accordingly, Nelson has stated a claim supported by our law. Yet, legal claims must also be supported by facts. When placed under the scrutiny of this legal proposition, Nelson's claim fails because the facts failed to support her claim. The fact of the matter is Nelson was terminated because of the activities of her consensual personal relationship with her employer, not because of her gender. A review of the summary judgment record bears out this conclusion.

It is an undisputed fact in this case, viewing the evidence in a light most favorable to Nelson, that Nelson and Dr. Knight developed a consensual personal relationship. Similarly, it is undisputed that this relationship extended well beyond the workplace. Nelson and Dr. Knight communicated with each other outside the workplace on matters extraneous to the employment. Their relationship was personal and closer than the relationships Dr. Knight maintained with the other employees. Dr. Knight readily acknowledged he grew attracted to Nelson and was developing feelings of intimacy, and it is accepted for purposes of summary judgment that these feelings were more developed than those possessed by Nelson. Yet, during a frustrating moment involving a co-employee, Nelson confided in Dr. Knight that he was the reason she continued to work at the office. She also acknowledged she maintained a closer relationship with Dr. Knight than he maintained with the other

employees in the office. Additionally, Nelson acknowledged that another employee in the office viewed her conduct towards Dr. Knight as flirting, although Nelson believed this employee felt she flirted with Dr. Knight because the employee was jealous of the close relationship she enjoyed with Dr. Knight.

The communication between Nelson and Dr. Knight included comments by Dr. Knight that were marked by sexual overtones. These communications have been explained by the majority. One evening after texting her about the tight shirt she wore to work that day, he followed up with another text message indicating it was good that her pants were also not too tight because he would "get it coming and going." Another time, in response to a comment regarding the relative infrequency of her sexual activity, Dr. Knight told Nelson, "That's like having a Lamborghini in the garage and not ever driving it." Dr. Knight also once texted Nelson to ask how often she experienced orgasms. While these comments would commonly be viewed as inappropriate in most any setting and, for sure, beyond the reasonable parameters of workplace interaction, they nevertheless were an undeniable part of the consensual personal relationship enjoyed by Nelson and Dr. Knight. The banter, at least, revealed a relationship that was much different than would reasonably be expected to exist between employers and employees in the workplace.

The personal relationship also lasted six months and did not end until Dr. Knight's wife discovered Nelson and Dr. Knight were texting each other while Dr. Knight was out of state on a vacation. Dr. Knight's wife examined phone records to discover the texting only because she

had grown suspicious of the relationship between Nelson and her husband.[12]

Mixed motives, of course, can support a sex-discrimination claim. *See Hopkins*, 490 U.S. at 246–47, 109 S. Ct. at 1788–89, 104 L. Ed. 2d at 285–86. Yet, the record contained no evidence to suggest a factor other than the relationship between Nelson and Dr. Knight was a motivation for the termination or that the relationship was a pretext for a discriminatory intent.

The absence of sexual intimacy in the relationship between Nelson and Dr. Knight, and the absence of sexually suggestive behavior on the part of Nelson, does factually distinguish this case from the line of cases that do not recognize a sex-discrimination claim based on a consensual, romantic relationship. Yet, this distinction does not shift this case into the line of gender-discrimination cases that protect women from discrimination based on their physical appearance. Even if Nelson was fired because Dr. Knight was physically attracted to her, the attraction and resulting threat to the Knights' marriage surfaced during and resulted from the personal relationship between Nelson and Dr. Knight, and there is no evidence in the summary judgment record tending to prove the relationship or Nelson's termination were instead consequences of a gender-based discriminatory animus. Ultimately, the question comes down to whether a reasonable fact finder could find that Dr. Knight's reasons for terminating Nelson were, even in light of the relationship, responses motivated by Nelson's status as a woman.

---

[12]The summary judgment record revealed Jeanne Knight, who also worked in the office, felt Nelson flirted with her husband at work and that she was cold towards her at work. She also felt Nelson "liked to hang around after work when it would just be her and [Dr. Knight] there." She felt Nelson also engaged in attention-seeking behavior in the office and enjoyed working close to her husband.

Courts evaluate this evidence "in light of common experience as it bears on the critical question of discrimination." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 2949, 57 L. Ed. 2d 957, 967 (1978).

True to our governing legal authorities, a sex-discrimination claim predicated on physical appearance accompanied by a consensual personal relationship between the employee and employer requires proof that the physical appearance of the plaintiff was a gender-based reason for the adverse employment action.[13]  An adverse employment action based on a personal relationship that existed here between Nelson and Dr. Knight—or its consequences—is not actionable discrimination based on sex under our statute.

In view of the undisputed fact of a personal relationship between Nelson and Dr. Knight, Nelson has failed to engender a fact question on her claim that Dr. Knight's decision to terminate her was motivated by her status as a woman.  The relationship, even in the context of summary judgment, included enough activity and conduct to support a determination as a matter of law that Nelson was terminated as a response to the consensual personal relationship she maintained with

---

[13]In determining whether the physical attraction and threats to the employer's marriage were responses to Nelson's conduct or responses to Nelson's status as a woman, the presence of a consensual personal relationship would not typically give rise to any inferences of gender-based sex discrimination within the relationship.  Indeed, inferences drawn from such a relationship and its effect on the workplace would be consistent with the opposite conclusion.  *See Preston v. Wis. Health Fund*, 397 F.3d 539, 541 (7th Cir. 2005) ("[Romantically motivated] favoritism is not based on a belief that women are better workers, or otherwise deserve to be treated better, than men; indeed, it is entirely consistent with the opposite opinion.").  For sure, romantic, sexually intimate relationships between employees and employers that have been found by courts to not support a claim of sex discrimination are often nevertheless marked by physical attractiveness and perceived threats to a marriage.  *See Tenge*, 446 F.3d at 907; *Platner*, 908 F.2d at 903.  Thus, a gender-based sex-discrimination claim involving a personal or sexual relationship is not established merely by evidence that an employer was sexually or romantically attracted to an employee.

Dr. Knight. In the context of the personal relationship, there was insufficient evidence tending to show that Nelson's status as a woman was also a motivating reason.

It is important to observe that a critical aspect of the entire analysis centers on the consensual and voluntary nature of the personal relationship. The law that navigates through the intersection between sex discrimination and personal workplace relationships to reach the destination of nondiscriminatory conduct requires willing participants to the relationship. Of course, a personal relationship between an employer and subordinate can give rise to subtle issues of power and control that may make the line between consensual and submissive relationships difficult to draw. *See generally* Billie Wright Dziech, Robert W. Dziech II & Donald B. Hordes, *'Consensual' or Submissive Relationships: The Second-Best Kept Secret,* 6 Duke J. Gender L. & Pol'y 83 (1999). This concern has been particularly observed in cases involving claims of sexual harassment, either hostile-environment claims or quid pro quo claims. *See Ammons-Lewis v. Metro. Water Reclamation Dist.,* 488 F.3d 739, 746 (7th Cir. 2007) (finding existence of voluntary relationship did not preclude sexual-harassment claim). Thus, the consensual aspect of a relationship is pivotal to the analysis of the claim of discrimination based on a personal relationship. In this case, it is undisputed the relationship was consensual. If it was not consensual, a turn in the analysis would occur. Yet, Nelson made no legal or factual claim that a relationship with Dr. Knight was submissive, objectionable, or harassing in any way, and there was no evidence in the record to hint the relationship was not jointly pursued. The role of consent is important to the responsibility of employees and employers of both sexes to monitor and control their conduct in the workplace.

While there is only a single standard for summary judgment, *see Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011); Iowa R. Civ. P. 1.981; *see also* Fed. R. Civ. P. 56, as a practical matter, it should be used sparingly in employment-discrimination cases. *See* Hon. Timothy M. Tymkovich, *The Problem with Pretext*, 85 Denv. U. L. Rev. 503, 519–22, 528–29 (2008). Ordinarily, employment discrimination cases generate genuine issues of material fact because they are "often fact intensive and dependent on nuance in the workplace." *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010). Yet, the claim of discrimination in this case was actually framed by Nelson without relying on inferences or conflicting evidence. In other words, Nelson did not argue that Dr. Knight's expressed reason for terminating her was actually a pretext for an underlying discriminatory intent to terminate her based on her status as a woman. Instead, Nelson used the same reasons to show the termination was discriminatory as Dr. Knight used to show the termination was not discriminatory. She never offered an explanation for how those reasons establish a discriminatory animus. Thus, the resolution of the case turns on context: Was Nelson's termination a response by Dr. Knight to a personal relationship or was it his response to Nelson's status as a woman? It is undisputed the relationship existed, and Nelson failed to generate a fact question on her claim that her termination was motivated by a stereotype involving her status as a woman.

While summary judgment must be granted with caution, courts are required to grant judgment for the movant when the legal standards have been met. In this case, there was insufficient evidence offered by Nelson in light of the undisputed evidence of a consensual personal relationship that would permit a reasonable fact finder to conclude by a

preponderance of the evidence that Dr. Knight terminated Nelson based on her status as a woman. In the final analysis, this court has carefully considered the issue presented and has sought to understand its complexity with the seriousness and attention demanded of all cases. Research has failed to uncover any appellate court in the nation that has recognized sex discrimination under facts similar to those in this case, and it has failed to identify any state legislature that has defined sex discrimination to include adverse employment consequences from a consensual personal relationship. If, in fact, Congress or our legislature intended for adverse employment consequences from consensual personal relationships between employers and employees to be protected as sex discrimination, these legislative bodies can clarify or change the law to reflect such intent. In the meantime, our law and this court remains devoted to carrying out the important legislative goal of eradicating discrimination from society, but this case simply lacked the facts to establish discrimination. Without proof of sex discrimination, the employment-at-will doctrine followed in Iowa guides the outcome.

Wiggins and Hecht, JJ., join this special concurrence.