MANSFIELD, Justice.[1]
Can a male employer terminate a longtime female employee because the employer’s wife, due to no fault of the employee, is concerned about the nature of the relationship between the employer and the employee? This is the question we are required to answer today. For the reasons stated herein, we ultimately conclude the conduct does not amount to unlawful sex discrimination in violation of the Iowa Civil Rights Act.
We emphasize the limits of our decision. The employee did not bring a sexual harassment or hostile work environment claim; we are not deciding how such a claim would have been resolved in this or any other case. Also, when an employer takes an adverse employment action against a person or persons because of a gender-specific characteristic, that can violate the civil rights laws. The record in this case, however, does not support such an allegation.
I. Facts and Procedural Background.
Because this case was decided on summary judgment, we set forth the facts in the light most favorable to the plaintiff, Melissa Nelson.
In 1999, Dr. Knight[2] hired Nelson to work as a dental assistant in his dental office. At that time, Nelson had just received her community college degree and was twenty years old.
Over the next ten-and-a-half years, Nelson worked as a dental assistant for Dr. Knight. Dr. Knight admits that Nelson was a good dental assistant. Nelson in turn acknowledges that Dr. Knight generally treated her with respect, and she believed him to be a person of high integrity.
On several occasions during the last year and a half when Nelson worked in the office, Dr. Knight complained to Nelson that her clothing was too tight and revealing and “distracting.” Dr. Knight at times asked Nelson to put on her lab coat. Dr. Knight later testified that he made these statements to Nelson because “I don’t think it’s good for me to see her wearing things that accentuate her body.” Nelson denies that her clothing was tight or in any way inappropriate.[3]
During the last six months or so of Nelson’s employment, Dr. Knight and Nelson started texting each other on both work and personal matters outside the workplace. Both parties initiated texting. Neither objected to the other’s texting. Both Dr. Knight and Nelson have children, and some of the texts involved updates on the kids’ activities and other relatively innocuous matters. Nelson considered Dr. Knight to be a friend and father figure, and she denies that she ever flirted with him or sought an intimate or sexual relationship with him. At the same time, Nelson admits that a coworker was “jealous that we got along.” At one point, Nelson *66 texted Dr. Knight that “[t]he only reason I stay is because of you.”
Dr. Knight acknowledges he once told Nelson that if she saw his pants bulging, she would know her clothing was too revealing. On another occasion, Dr. Knight texted Nelson saying the shirt she had worn that day was too tight. After Nelson responded that she did not think he was being fair, Dr. Knight replied that it was a good thing Nelson did not wear tight pants too because then he would get it coming and going. Dr. Knight also recalls that after Nelson allegedly made a statement regarding infrequency in her sex life, he responded to her, “[T]hat’s like having a Lamborghini in the garage and never driving it.” Nelson recalls that Dr. Knight once texted her to ask how often she experienced an orgasm. Nelson did not answer the text. However, Nelson does not remember ever telling Dr. Knight not to text her or telling him that she was offended.
In late 2009, Dr. Knight took his children to Colorado for Christmas vacation. Dr. Knight’s wife Jeanne, who was also an employee in the dental practice, stayed home. Jeanne Knight found out that her husband and Nelson were texting each other during that time. When Dr. Knight returned home, Jeanne Knight confronted her husband and demanded that he terminate Nelson’s employment. Both of them consulted with the senior pastor of their church, who agreed with the decision.
Jeanne Knight insisted that her husband terminate Nelson because “she was a big threat to our marriage.” According to her affidavit and her deposition testimony, she had several complaints about Nelson. These included Nelson’s texting with Dr. Knight, Nelson’s clothing, Nelson’s alleged flirting with Dr. Knight, Nelson’s alleged coldness at work toward her (Jeanne Knight), and Nelson’s ongoing criticism of another dental assistant. She added that
[Nelson] liked to hang around after work when it would be just her and [Dr. Knight] there. I thought it was strange that after being at work all day and away from her kids and husband that she would not be anxious to get home like the other [women] in the office.
At the end of the workday on January 4, 2010, Dr. Knight called Nelson into his office. He had arranged for another pastor from the church to be present as an observer. Dr. Knight, reading from a prepared statement, told Nelson he was firing her. The statement said, in part, that their relationship had become a detriment to Dr. Knight’s family and that for the best interests of both Dr. Knight and his family and Nelson and her family, the two of them should not work together. Dr. Knight handed Nelson an envelope which contained one month’s severance pay. Nelson started crying and said she loved her job.
Nelson’s husband Steve phoned Dr. Knight after getting the news of his wife’s firing. Dr. Knight initially refused to talk to Steve Nelson, but later called back and invited him to meet at the office later that same evening. Once again, the pastor was present. In the meeting, Dr. Knight told Steve Nelson that Melissa Nelson had not done anything wrong or inappropriate and that she was the best dental assistant he ever had. However, Dr. Knight said he was worried he was getting too personally attached to her. Dr. Knight told Steve Nelson that nothing was going on but that he feared he would try to have an affair with her down the road if he did not fire her.
Dr. Knight replaced Nelson with another female. Historically, all of his dental assistants have been women.
*67 After timely filing a civil rights complaint and getting a “right to sue” letter from the Iowa Civil Rights Commission, Nelson brought this action against Dr. Knight on August 12, 2010. Nelson’s one-count petition alleges that Dr. Knight discriminated against her on the basis of sex. Nelson does not contend that her employer committed sexual harassment. See McElroy v. State, 637 N.W.2d 488, 499-500 (Iowa 2001) (discussing when sexual harassment amounts to unlawful sex discrimination and restating the elements of both quid pro quo and hostile work environment sexual harassment). Her argument, rather, is that Dr. Knight terminated her because of her gender and would not have terminated her if she was male.
Dr. Knight moved for summary judgment. After briefing and oral argument, the district court sustained the motion. The court reasoned in part, “Ms. Nelson was fired not because of her gender but because she was a threat to the marriage of Dr. Knight.” Nelson appeals.
II. Standard of Review.
We review the district court’s summary judgment ruling for correction of errors at law. Pecenka v. Fareway Stores, Inc., 672 N.W.2d 800, 802 (Iowa 2003). We view the factual record in the light most favorable to the nonmoving party, affording that party all reasonable inferences. Id. Summary judgment is proper only if the record, so viewed, entitles the moving party to judgment as a matter of law. Id.
III. Analysis.
Section 216.6(l)(a) of the Iowa Code makes it generally unlawful to discharge or otherwise discriminate against an employee because of the employee’s sex. Iowa Code § 216.6(l)(a) (2009). “When interpreting discrimination claims under Iowa Code chapter 216, we turn to federal law, including Title VII of the United States Civil Rights Act....” Deboom v. Raining Rose, Inc., 772 N.W.2d 1, 7 (Iowa 2009). Generally, an employer engages in unlawful sex discrimination when the employer takes adverse employment action against an employee and sex is a motivating factor in the employer’s decision. See Channon v. United Parcel Serv., Inc., 629 N.W.2d 835, 861 (Iowa 2001).
Nelson argues that her gender was a motivating factor in her termination because she would not have lost her job if she had been a man. See, e.g., Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 213, 222 (3d Cir.2000) (affirming a jury verdict in a Title VII case because the charge, taken as a whole, adequately informed the jury that sex had to be a but-for cause of the adverse employment action). Dr. Knight responds that Nelson was terminated not because of her sex — after all, he only employs women — but because of the nature of their relationship and the perceived threat to Dr. Knight’s marriage. Yet Nelson rejoins that neither the relationship nor the alleged threat would have existed if she had not been a woman.
Several cases, including a decision of the United States Court of Appeals for the Eighth Circuit, have found that an employer does not engage in unlawful gender discrimination by discharging a female employee who is involved in a consensual relationship that has triggered personal jealousy. This is true even though the relationship and the resulting jealousy presumably would not have existed if the employee had been male.
Tenge v. Phillips Modem Ag Co., like the present case, centered on a personal relationship between the owner of a small business and a valued employee of the business that was seen by the owner’s wife as a threat to their marriage. 446 F.3d *68 903, 905-06 (8th Cir.2006). In that case, unlike here, the plaintiff had pinched the owner’s rear. Id. at 906. She admitted that the owner’s wife “could have suspected the two had an intimate relationship.” Id. Further, the plaintiff acknowledged she wrote “notes of a sexual or intimate nature” to the owner and put them in a location where others could see them. Id. In the end, the owner fired the plaintiff, stating that his wife was “ ‘making me choose between my best employee or her and the kids.’ ” Id.
Reviewing this series of events, the Eighth Circuit affirmed the summary judgment in favor of the defendants. Id. at 911. The Eighth Circuit first noted the considerable body of authority that “ ‘sexual favoritism,’ where one employee was treated more favorably than members of the opposite sex because of a consensual relationship with the boss,” does not violate Title VII. Id. at 908-09. The court distilled that law as follows:
[T]he principle that emerges from the above cases is that absent claims of coercion or widespread sexual favoritism, where an employee engages in consensual sexual conduct with a supervisor and an employment decision is based on this conduct, Title VII is not implicated because any benefits of the relationship are due to the sexual conduct, rather than the gender, of the employee.
Id. at 909.
The Eighth Circuit believed these sexual favoritism precedents were relevant. The court’s unstated reasoning was that if a specific instance of sexual favoritism does not constitute gender discrimination, treating an employee unfavorably because of such a relationship does not violate the law either.
Yet the court acknowledged that cases where the employee was treated less favorably would be “more directly analogous.” Id. The court then discussed a decision of the Eleventh Circuit where an employee had been terminated for being a perceived threat to the marriage of the owner’s son. Id. (discussing Platner v. Cash & Thomas Contractors, Inc., 908 F.2d 902, 903-05 (11th Cir.1990)). It also cited three federal district court cases, each of which had “concluded that terminating an employee based on the employee’s consensual sexual conduct does not violate Title VII absent allegations that the conduct stemmed from unwelcome sexual advances or a hostile work environment.” Id. (citing Kahn v. Objective Solutions, Int’l, 86 F.Supp.2d 377, 382 (S.D.N.Y.2000); Campbell v. Masten, 955 F.Supp. 526, 529 (D.Md.1997); Freeman v. Cont'l Technical Serv., Inc., 710 F.Supp. 328, 331 (N.D.Ga.1988)).
After reviewing these precedents, the Eighth Circuit found the owner had not violated Title VII in terminating the employee at his wife’s behest. As the court explained, “The ultimate basis for Tenge’s dismissal was not her sex, it was Scott’s desire to allay his wife’s concerns over Tenge’s admitted sexual behavior with him.” Id. at 910.
In our case, the district court quoted at length from Tenge, stating it found that decision “persuasive.” However, Nelson argues there is a significant factual difference between the two cases. As the Eighth Circuit put it, “Tenge was terminated due to the consequences of her own admitted conduct with her employer, not because of her status as a woman.” Id. The Eighth Circuit added a caveat:
The question is not before us of whether it would be sex discrimination if Tenge had been terminated because Lori [the owner’s wife] perceived her as a threat to her marriage but there was no evidence that she had engaged in any sexually suggestive conduct.
*69 Id. at 910 n. 5. Nelson contrasts that situation with her own, where she claims she “did not do anything to get herself fired except exist as a female.”
So the question we must answer is the one left open in Tenge — whether an employee who has not engaged in flirtatious conduct may be lawfully terminated simply because the boss’s spouse views the relationship between the boss and the employee as a threat to her marriage. Notwithstanding the Eighth Circuit’s care to leave that question unanswered, it seems odd at first glance to have the question of whether the employer engaged in unlawful discrimination turn on the employee’s conduct, assuming that such conduct (whatever it is) would not typically be a firing offense. Usually our legal focus is on the employer’s motivation, not on whether the discharge in a broader sense is fair. Title VII and the Iowa Civil Rights Act are not general fairness laws, and an employer does not violate them by treating an employee unfairly so long as the employer does not engage in discrimination based upon the employee’s protected status.
In some respects, the present case resembles Platner. There a business owner chose to terminate a female employee who worked on the same crew as the business owner’s son, after the wife of the business owner’s son became “extremely jealous” of her. Platner, 908 F.2d at 903. The district court found that the son was “largely to blame for fueling [the wife’s] jealousy,” and that the plaintiffs conduct was “basically blameless and no different from that of the male employees.” Id. Nonetheless, the Eleventh Circuit found no unlawful discrimination had occurred:
It is evident that Thomas, faced with a seemingly insoluble conflict within his family, felt he had to make a choice as to which employee to keep. He opted to place the burden of resolving the situation on Platner, to whom he was not related, and whose dismissal would not, as firing Steve obviously would, fracture his family and its relationships. It is thus clear that the ultimate basis for Platner’s dismissal was not gender but simply favoritism for a close relative.
Id. at 905. Significantly, although Dr. Knight discusses Platner at some length in his briefing, Nelson does not refer to the decision in her briefing or attempt to distinguish it.[4]
*70 Nelson does, however, have three responses to Dr. Knight’s overall position. First, she does not necessarily agree with Tenge. She argues that any termination because of a supervisor’s interest in an employee amounts to sex discrimination: “Plaintiffs sex is implicated by the very nature of the reason for termination.” Second, she suggests that without some kind of employee misconduct requirement, Dr. Knight’s position becomes simply a way of enforcing stereotypes and permitting pretexts: The employer can justify a series of adverse employment actions against persons of one gender by claiming, “My spouse was jealous.” Third, she argues that if Dr. Knight would have been liable to Nelson for sexually harassing her, he should not be able to avoid liability for terminating her out of fear that he was going to harass her.
Nelson’s arguments warrant serious consideration, but we ultimately think a distinction exists between (1) an isolated employment decision based on personal relations (assuming no coercion or quid pro quo), even if the relations would not have existed if the employee had been of the opposite gender, and (2) a decision based on gender itself. In the former case, the decision is driven entirely by individual feelings and emotions regarding a specific person. Such a decision is not gender-based, nor is it based on factors that might be a proxy for gender.
The civil rights laws seek to insure that employees are treated the same regardless of their sex or other protected status. Yet even taking Nelson’s view of the facts, Dr. Knight’s unfair decision to terminate Nelson (while paying her a rather ungenerous one month’s severance) does not jeopardize that goal. As the Platner court observed, “ ‘[W]e do not believe that Title VTI authorizes courts to declare unlawful every arbitrary and unfair employment decision.’ ” Id. at 905 (quoting Holder v. City of Raleigh, 867 F.2d 823, 825-26 (4th Cir.1989)).
Nelson’s viewpoint would allow any termination decision related to a consensual relationship to be challenged as a discriminatory action because the employee could argue the relationship would not have existed but for her or his gender. This logic would contradict federal caselaw to the effect that adverse employment action stemming from a consensual workplace relationship (absent sexual harassment) is not actionable under Title VII. See, e.g., Benders v. Bellows & Bellows, 515 F.3d 757, 768 (7th Cir.2008) (holding that allegations that an employee’s termination was based on the owner’s desire to hide a past consensual relationship from his wife were “insufficient to support a cause of action for sex discrimination”); see also Blackshear v. Interstate Brands Corp., No. 10-3696, 2012 WL 3553499, at *3 (6th Cir.2012) (affirming summary judgment for the employer where the employee presented evidence that she was treated unfairly due to her supervisor’s jealousy of her relationship with another employee, and noting that such “personal animus ... cannot be the basis of a discrimination claim under federal or Ohio law”); West v. MCI Worldcom, Inc., 205 F.Supp.2d 531, 544-45 (E.D.Va.2002) (granting summary judgment to an employer when an employee was removed from a project because of a *71 supervisor’s animosity toward the employee over her termination of their consensual relationship but there was no evidence the supervisor had made unwanted advances to the employee following the termination of that relationship).
Nelson raises a legitimate concern about a slippery slope. What if Jeanne Knight demanded that her spouse terminate the employment of several women? Of course, a pretext does not prevail in a discrimination case. See St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 2751-52, 125 L.Ed.2d 407, 421-22 (1993) (discussing how a plaintiff can prove that an employer’s reason for a firing was not legitimate, but a pretext for discrimination). If an employer repeatedly took adverse employment actions against persons of a particular gender, that would make it easier to infer that gender and not a relationship was a motivating factor. Here, however, it is not disputed that Jeanne Knight objected to this particular relationship as it had developed after Nelson had already been working at the office for over ten years.
It is likewise true that a decision based on a gender stereotype can amount to unlawful sex discrimination. Price Waterhouse v. Hopkins, 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268, 288 (1989) (“As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for [i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.” (Citation and internal quotation marks omitted.)), superseded by statute, Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, 1075-76, as recognized in Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S.-,-, 133 S.Ct. 2517, 2526, 186 L.Ed.2d 503, - (2013); see also City of L.A., Dep’t of Water & Power v. Manhart, 435 U.S. 702, 707, 98 S.Ct. 1370, 1375, 55 L.Ed.2d 657, 664-65 (1978) (“It is now well recognized that employment decisions cannot be predicated on mere ‘stereotyped’ impressions about the characteristics of males or females.”); Schwenk v. Hartford, 204 F.3d 1187, 1202 (9th Cir.2000) (“Discrimination because one fails to act in the way expected of a man or woman is forbidden under Title VII.”). If Nelson could show that she had been terminated because she did not conform to a particular stereotype, this might be a different case. But the record here does not support that conclusion. It is undisputed, rather, that Nelson was fired because Jeanne Knight, unfairly or not, viewed her as a threat to her marriage.[5]
The present case can be contrasted with another recent Eighth Circuit decision. In Lewis v. Heartland Inns of America, *72 L.L.C., a female front desk employee at a hotel claimed she lost her job because she did not have the “Midwestern girl look.” 591 F.3d 1033, 1037 (8th Cir.2010). As the court explained, “The theory of [Lewis’s] case is that the evidence shows Heartland enforced a de facto requirement that a female employee conform to gender stereotypes in order to work the A shift.” Id. In fact, the evidence showed that motel management later procured video equipment so they could observe the appearance of front desk applicants prior to hiring. Id. at 1042. The Eighth Circuit reversed the district court’s grant of summary judgment to the employer and remanded for trial. Id. However, the critical difference between Lewis and this case is that Nelson indisputably lost her job because Dr. Knight’s spouse objected to the parties’ relationship. In Lewis, by contrast, no relationship existed.
Nelson also raises a serious point about sexual harassment. Given that sexual harassment is a violation of antidiscrimi-nation law, Nelson argues that a firing by a boss to avoid committing sexual harassment should be treated similarly.[6] But sexual harassment violates our civil rights laws because of the “hostile work environment” or “abusive atmosphere” that it has created for persons of the victim’s sex. See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 786-90, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662, 675-78 (1998). On the other hand, an isolated decision to terminate an employee before such an environment arises, even if the reasons for termination are unjust, by definition does not bring about that atmosphere.[7]
As a Michigan appellate court observed regarding a male employee’s claim that he had been subjected to sex discrimination:
We do not read the [Michigan Civil Rights Act or CRA] to prohibit conduct based on romantic jealousy.... Interpreting the CRA’s prohibition of discrimination based on sex to prohibit conduct based on romantic jealousy turns the CRA on its head. The CRA was enacted to prevent discrimination because of classifications specifically enumerated by the Legislature and to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases. It is beyond reason to conclude that plaintiffs status as the romantic competition to the woman Vajda sought to date places plaintiff within the class of individuals the Legislature sought to protect when it prohibited discrimination based on sex under the CRA.
Plaintiff proceeded to trial on a theory of discrimination based on romantic jealousy. Plaintiff did not claim and the evidence did not establish that plaintiff was required to submit to sexually-based harassment as a condition of employment. Nor did the evidence presented at trial support a theory of gender-based discrimination. Plaintiff established, at most, that Vajda’s alleged adverse treatment of plaintiff was based on plaintiffs relationship with Goshorn, not plaintiffs gender. Vajda may have had a romantic purpose in initially pursuing Goshorn and may, as the trial court surmised, have intended to eliminate plaintiff so that he could pursue Goshorn’s affections. However, Vajda’s alleged harassment was not conduct that is proscribed *73 by the CRA because it was not gender-based. Indeed, if Vajda’s motive was to win the affection of Goshorn, it would not matter if the person Vajda perceived to be standing in his way was male or female. As such, it is evident that plaintiffs gender was not the impetus for Vajda’s alleged conduct, but rather was merely coincidental to that conduct.
Barrett v. Kirtland Cmty. Coll., 245 Mich.App. 306, 628 N.W.2d 63, 74 (2001) (citations omitted); see also Huffman v. City of Prairie Vill., 980 F.Supp. 1192, 1199 (D.Kan.1997) (“Plaintiff suggests that the actions taken by Lt. Young as a result of Lt. Young’s beliefs concerning plaintiffs relationship with another police officer constitute gender discrimination because such actions would not have been taken against plaintiff but for her gender. We cannot agree with plaintiffs expansive definition of discrimination based upon sex.”); Bush v. Raymond Corp., 954 F.Supp. 490, 498 (N.D.N.Y.1997) (“[Pjlaintiffs discriminatory discharge claim fails insofar as it asserts that plaintiff was discharged because of Rusnak’s perception that plaintiff and Sawyer had a sexual relationship.”). Our decision today is consistent with these authorities.
IV. Conclusion.
As we have indicated above, the issue before us is not whether a jury could find that Dr. Knight treated Nelson badly. We are asked to decide only if a genuine fact issue exists as to whether Dr. Knight engaged in unlawful gender discrimination when he fired Nelson at the request of his wife. For the reasons previously discussed, we believe this conduct did not amount to unlawful discrimination, and therefore we affirm the judgment of the district court.
AFFIRMED.
All justices concur except CADY, C.J., WIGGINS and HECHT, JJ., who concur specially.

. By previous order, the petition for rehearing in this case was granted and the original opinion dated December 21, 2012, was withdrawn. This opinion is now substituted.

. We will refer to the defendants Dr. James Knight and James H. Knight DDS, P.C. collectively as "Dr. Knight.”

.Nelson recalls that Dr. Knight said her clothing was too "distracting” and that he "may have” asked her to put on her lab coat. In any event, she testified that she put on a coat whenever Dr. Knight complained to her about her clothing.

. When asked about Platner at oral argument, Nelson’s counsel offered fair criticism of some of the language used in the opinion. See Platner, 908 F.2d at 903 n. 2.
Our research has found one case, not cited by the parties, where the court arguably found the lack of an actual consensual relationship to be significant. In Mittl v. New York State Division of Human Rights, the complaining witness alleged she was unlawfully terminated due to her pregnancy. 100 N.Y.2d 326, 763 N.Y.S.2d 518, 794 N.E.2d 660, 662 (2003). The employer, an ophthalmologist, denied the discrimination and indicated he fired the employee because of the insistence of his wife who "began displaying extreme animosity toward [the employee], even questioning whether [her husband] was the father of the child.” Mittl v. N.Y. State Div. of Human Rights, 293 A.D.2d 255, 741 N.Y.S.2d 19, 20 (2002), rev’d, 100 N.Y.2d 326, 763 N.Y.S.2d 518, 794 N.E.2d 660. The intermediate appellate court overturned the agency finding of pregnancy discrimination, concluding the employer “was forced to choose between keeping his secretary on the payroll and saving his marriage.” Id. However, the New York Court of Appeals found that substantial evidence supported the agency finding that the employer had discriminated based on pregnancy. See Mittl, 763 N.Y.S.2d 518, 794 N.E.2d at 663. That court noted, among other things, that the employer had told the complainant her “pregnancy was ‘becoming a problem’ in the office.” Id. The court added that certain cases cited by the intermediate court were "inapposite” because they involved situations where plaintiffs "were terminated in the aftermath of consensual sexual relationships with their employ *70 ers” whereas here “neither party alleges that the termination had anything to do with an actual sexual relationship between the parties.” Id. at 664. Notwithstanding this language in the court's opinion, we do not believe Mittl ultimately has any bearing on the present case because there was substantial evidence in Mittl that the employer had engaged in unlawful, pregnancy-based discrimination, regardless of whether a consensual relationship existed.

. As we have noted above, Jeanne Knight said that she thought it was "strange that after being at work all day and away from her kids and husband that [Nelson] would not be anxious to get home like the other [women] in the office.” Viewed in isolation, this statement could be an example of a gender-based stereotype. However, as with Jeanne Knight’s other comments regarding Nelson, this statement was linked to a specific concern about Nelson’s relationship with her husband. This statement immediately followed Jeanne Knight’s claim that Nelson "liked to hang around after work when it would be just her and [Dr. Knight] there.” Viewing the summary judgment record, we come to the same conclusion as the district court: There is no genuine issue of material fact that the reason for Nelson’s firing was Jeanne Knight's demand that she be fired, which was based in turn upon Jeanne Knight's perception that the relationship between Dr. Knight and Nelson was a threat to the marriage.

. Allegedly, Dr. Knight told Nelson's husband that he “feared that he would try to have an affair with her down the road if he did not fire her.”

. The record indicates that Dr. Knight made a number of inappropriate comments toward Nelson that are of a type often seen in sexual harassment cases. But as already noted, Nelson does not allege in this case that she was a victim of sexual harassment.