# IN THE COURT OF APPEALS OF IOWA

No. 13-0606
Filed April 30, 2014


**ROBERT J. BRUNKHORST and RANDALL E. LEWIS,**
**Individually and as Representative of all Similarly**
**Situated IOWA PUBLIC EMPLOYEES' RETIREMENT**
**SYSTEM MEMBERS,**
　　　　Plaintiffs-Appellants,

**vs.**

**IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM,**
**THE STATE OF IOWA, INVESTMENT BOARD OF**
**IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, and**
**ALL ADVISORS AND CONSULTANTS OF IOWA PUBLIC**
**EMPLOYEES' RETIREMENT SYSTEM,**
　　　　Defendants-Appellees.
_____

　　　　Appeal from the Iowa District Court for Polk County, Christopher L.

McDonald, Judge.



　　　　The plaintiffs appeal from the district court ruling granting the defendants'

motion for summary judgment. **AFFIRMED.**



　　　　Alexander E. Wonio and David L. Brown of Hansen, McClintock & Riley,

Des Moines, for appellants.

　　　　Thomas J. Miller, Attorney General, and Tyler M. Smith, Assistant

Attorney General, Department of Special Litigation, Des Moines, for appellees.



　　　　Heard by Potterfield, P.J., and Doyle and Mullins, JJ.  McDonald, J., takes

no part.

**DOYLE, J.**

Plaintiffs Robert Brunkhorst and Randall Lewis appeal from the district court's ruling granting the defendants' motion for summary judgment. The district court ruled there was no triable issue of fact on the wanton or malicious conduct claim as to any defendant, the plaintiffs lacked standing, the plaintiffs' claims were barred by the statute of limitations, and the plaintiffs' claims were barred by discretionary-function immunity. We choose to affirm on the standing ground.

### I. *Background Facts and Proceedings*.

The district court set forth the background facts from the summary judgment record as follows:

> [The Iowa Public Employees' Retirement System (IPERS)] is an independent agency charged with administering the defined benefit retirement system established under Iowa Code chapter 97B. Iowa Code § 97B.1(1) [(1999)[1]]. IPERS is administered by its chief executive officer, who, at times material to this action, was [Gregory] Cusack. *Id.* § 97B.4. Moneys collected pursuant to chapter 97B, together with all interest, dividends, rents, securities or investment income, and assets, are held in the Iowa Public Employees' Retirement Fund ("retirement fund") separate and apart from all other public moneys of the state of Iowa. *Id.* § 97B.7(1). The treasurer of the state of Iowa is the custodian of the retirement fund. *Id.* § 97B.7(2). The investment board of [IPERS] ("board") is the trustee of the retirement fund. *Id.* § 97B.8A. The board is charged with establishing policy and reviewing policy implementation in matters relating to the investment of the retirement fund. *Id.* The board is also charged with the duty of selecting the actuary to be employed by the system and adopting all other necessary factors for use in actuarial calculations required in administering IPERS. *Id.* §§ 97B.8, .59.
>
> Participants in the retirement system are called "members" of IPERS. *Id.* § 97B.1A(14). Active members of IPERS and their respective employers are required to make "contributions," or payments, to IPERS to fund retirement benefits. *See id.* §§ 97B.1A(7), .11. In 1999, an employee member's required

---

[1] The citations to the Iowa Code in this opinion refer to the 1999 Code of Iowa unless otherwise noted.

contribution was 3.7% of the employee's covered wages. *Id.* § 97B.11. An employer's required contribution was 5.75% of an employee member's covered wages. *Id.* . . . [U]nder this contribution formula, an employee member contributed 40% and an employer contributed 60% of the total contribution. [*See, e.g., id.* § 97B.72(2)(b); Iowa Admin. Code r. 581-21.24(6)(d) (1999) (setting forth cost of "service buy-in/buy-back" for legislative members).]

. . . .

A "member" of IPERS is [statutorily defined as] an employee or former employee who maintains his or her "accumulated contributions" in the retirement system. Iowa Code § 97B.1A(14). In 1999, upon termination of employment prior to retirement, a member could, among other things, request and receive a refund of his or her accumulated contributions. *Id.* § 97B.53(4). By definition, this amount did not include the accumulated employer contributions for the employee, which IPERS retained. *See id.* § 97B.1A(2) (defining "accumulated contributions" as individual contributions by the member"). A former employee is no longer a member of IPERS if he or she received a refund of his or her accumulated contributions. *Id.* § 97B.1A(14).

Under certain circumstances, a member may purchase service credits by paying additional monies into IPERS and thereby increasing the number of service years applied toward retirement. *See, e.g., id.* § 97B.74. There are two types of service credits: buy-backs and buy-ins. [*See* Iowa Admin. Code r. 581-21.24.] Prior to July 1, 1999, a [former] vested or retired member who received a refund of his or her accumulated contributions could "buy-back" service credits by repaying the accumulated contributions received plus accumulated interest and interest dividends, from the date of receipt to the date of repayment. *See* Iowa Code § 97B.74 (1997). The repayment amount thus only included the employee's accumulated contributions refunded. *See id.* (1997). A [former] member could also purchase service credit for service rendered to another public employer, which is referred to as a "buy-in." [*See id.* § 97B.43 (1997); Iowa Admin. Code r. 581-21.24(2) (1997).] Unlike a buy-back, a buy-in required the [former] member to pay both the employee and employer contribution for each calendar quarter of service purchased. [*See* Iowa Code § 97B.43 (1997) (requiring the individual to redeposit any withdrawn "contributions"); *see also id.* § 97B.41(7) (1997) (defining "contributions" as "payments to the fund required herein, by the employer and by the members, to provide the benefits of the system"); Iowa Admin. Code r. 581-21.24(2)(b) (1997) (requiring the individual to make "employer and employee contributions to IPERS" for buy-in).]

In 1998, a study conducted by IPERS's actuarial service firm, Milliman and Robertson ("Milliman"), concluded that buy-backs

and buy-ins were being purchased disproportionately by older members who were able to determine more easily the net benefit of the purchase. This adverse selection or selection bias was resulting in an unfunded actuarial accrued liability because of the manner in which service purchases were being funded.

In 1998, the general assembly amended chapter 97B in two respects material to this litigation. *See* 1998 Iowa Acts ch. 1183. The two amendments—and IPERS's response to the same—are the crux of the parties' dispute.

. . . .

The summary judgment record establishes that . . . [the legislature] made two amendments to chapter 97B relevant to this litigation. *See id.* First, one amendment required that, effective July 1, 1999, all members wishing to purchase service credit "make contributions in an amount equal to the actuarial cost of the service purchase." *Id.* § 67 (codified at Iowa Code § 97B.74(2)(b)). The amendment further provided that "the actuarial cost of the service purchase is an amount determined by the department in accordance with actuarial tables, as reported to the department by the system's actuary, which reflects the actuarial cost necessary to fund an increased retirement allowance resulting from the purchase of additional service." *Id.* . . .

Second, the same legislation also amended the provision regarding payment of contributions upon termination of employment prior to retirement. *See id.* § 57 (codified at Iowa Code § 97B.53). The amendment provided that "for a vested member, the accumulated employer contributions for the vested member" be paid on application. *See id.* Prior to this amendment, the law allowed only the refund of the employee's accumulated contributions and not both the accumulated contributions and the accumulated employer contributions. [*See* Iowa Code § 97B.53 (1997).]

The summary judgment record establishes that IPERS worked with its actuary, Milliman, to implement the actuarial cost formula as required. In anticipation of the amendment, Milliman and IPERS discussed amending their contract to provide for the calculation of individualized actuarial costs for service purchases. In December 2008, IPERS finalized the amendment to the Milliman contract, and Milliman agreed to provide IPERS "twice a month in the individualized actuarial cost of service purchases." Notably, the contract required that the cost of service purchases calculated by Milliman "shall be based on the applicable law, administrative rules, and any other written instructions provided by IPERS." By February 1999, IPERS and Milliman had agreed upon the calculation methodology used to determine the "actuarial cost" of service purchases. Under the methodology, the contribution required for a buy-back would reflect a 60% actuarial credit to

reflect that IPERS retained the accumulated employer contributions after the member received the refund of accumulated contributions. Under the methodology, buy-ins did not receive actuarial credit because no corresponding accumulated employer contributions reduced the actuarial cost of the service purchase. IPERS implemented the statutory changes by the effective date and began requiring members to pay the actuarial costs, as determined by IPERS and Milliman, for both buy-backs and buy-ins.

IPERS continued to distinguish between the contributions required for buy-backs and buy-ins through January 14, 2004, on the basis that, with respect to buy-backs, the accumulated employer's contributions remained with IPERS after the member received a refund of his or her accumulated contributions. Effective January 14, 2004, IPERS changed its actuarial cost formula for buy-backs by discontinuing the application of the actuarial credit. In January 2004, Cusack sent a memo to members explaining the change. Cusack explained that the actuarial credit applied to buy-backs was unsound insofar as it failed to reflect the 1999 amendment that allowed vested members to receive a portion of accumulated employer contributions plus interest. He explained that IPERS and "especially 'me,' Greg Cusack" "goofed in not catching the need for this change five years ago!"

[The Fiscal Services Division of the Iowa Legislative Service Agency] concluded that between the effective date of the law and the effective date of IPERS's January 2004 change, 3523 employees purchased buy-backs. If those members had paid contributions in accord with IPERS's new actuarial cost methodology for buy-backs, IPERS would have collected an additional $29.2 million in contributions, assuming that the same number of members would have completed the buy-backs at the higher price. In addition, because IPERS honored price quotes through September 2004, IPERS would have collected an additional $8.6 million in contributions from an additional 600 employees who exercised their buy-back rights under the old formula. In total, viewing the facts in the light most favorable to the plaintiffs, IPERS admitted incorrect actuarial cost methodology resulted in lost contributions in the amount of $37.8 million.

(Internal footnotes omitted.)

Plaintiff Robert Brunkhorst first became an IPERS member in 1995, and he made contributions to IPERS from then until sometime in 2006. In 2006, Brunkhorst stopped making contributions to IPERS; however, he did not request a refund of his contributions. He thereby became an inactive member of IPERS.

*See* Iowa Code § 97B.1A(12) (2005) (defining "inactive member"). He remained inactive from 2007 to 2009. He became an active member again in 2010, when he returned to public service. At that time, he re-enrolled in IPERS and again began making contributions to IPERS, changing his status from an inactive member to active member. *See id.* § 97B.1A(3) (2007) (defining "active member"). At all relevant times, Brunkhorst never received a refund of contributions nor did he ever purchase a service credit via buy-back or buy-in.

On January 13, 2006, Brunkhorst filed a claim with the Iowa State Appeal Board pursuant to the Iowa Tort Claims Act, Iowa Code chapter 669, alleging a tort claim against the State, IPERS, and others, as a member of a class. His claim was based upon the flaw in IPERS's actuarial methodology implemented in response to the 1999 legislation. He alleged $37 million in property damages. His claim was denied in August 2006.

On February 7, 2007, Brunkhorst filed a petition in district court against the defendants alleging a class action suit with numerous counts, including a common-law claim for breach of fiduciary duty. At that time, Brunkhorst was not an active member of IPERS because he was not paying any contributions to IPERS and had not sought retirement benefits.

The defendants filed a motion to dismiss the petition on numerous grounds. After a hearing, the motion was granted by the district court. Brunkhorst appealed the ruling, and we reversed the district court's dismissal order and remanded the case for further proceedings. *See Brunkhorst v. Iowa Pub. Emps.' Ret. Sys.*, No. 07-1340, 2008 WL 4724726, *1 (Iowa Ct. App. Oct. 29, 2008).

In July 2009, an amended petition was filed adding plaintiff Randall E. Lewis to the case (hereinafter "the plaintiffs"). Lewis had been an active member of IPERS from 1991 to 2007. He made an application for a service purchase on December 21, 2007, but he never completed the purchase. He began receiving IPERS benefits in January 2009. He filed a tort claim on July 1, 2009, which was denied on October 5, 2009. Lewis never claimed a reduction in benefits.

The defendants filed a motion for summary judgment. Following briefing and hearings, the district court entered its thorough and well-reasoned twenty-nine-page ruling granting the defendants' motion.[2] Specifically, the court found each of the grounds urged by the defendants supported summary judgment, concluding: (1) the plaintiffs failed to create a triable issue of fact on their breach-of-fiduciary-duty common-law claim because there was not sufficient evidence from which a jury could infer that the defendants engaged in wanton or malicious conduct; (2) the plaintiffs lacked standing to bring the claim; (3) the district court was without jurisdiction over the plaintiffs' claim, and (4) discretionary-function immunity barred the plaintiffs' claim against the defendants.

The plaintiffs now appeal.

## II. Scope and Standards of Review.

We review a district court's ruling on summary judgment for correction of errors of law. Iowa R. App. P. 6.907; *Osmic v. Nationwide Agribusiness Ins. Co.*, 841 N.W.2d 853, 858 (Iowa 2014). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[2] In its ruling, the court also granted the defendants' motion to dismiss the plaintiffs' claims against Gregory Cusack, individually and as a representative of all personnel of IPERS. This is not an issue on appeal.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3); *Thomas v. Gavin*, 838 N.W.2d 518, 521 (Iowa 2013). We examine the record in the light most favorable to the nonmoving party, *Sallee v. Stewart*, 827 N.W.2d 128, 133 (Iowa 2013), and we "afford the nonmoving party every legitimate inference that can be reasonably deduced from the evidence." *Boelman v. Grinnell Mut. Reins. Co.*, 826 N.W.2d 494, 501 (Iowa 2013) (citation and internal quotation marks omitted).

"An issue is 'material' only when the dispute is over facts that might affect the outcome of the suit, given the applicable governing law." *Sallee*, 827 N.W.2d at 132-33 (citation and internal quotation marks omitted). "If reasonable minds can differ on how the issue should be resolved, a fact question is generated, and the district court should deny summary judgment." *Boelman*, 826 N.W.2d at 501 (citation and internal quotation marks omitted). However, if the "motion for summary judgment is properly supported, the nonmoving party is required to respond with specific facts that show a genuine issue for trial." *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 253 (Iowa 2012) (citation and internal quotation marks omitted). Our role on appeal is to decide whether the district court correctly determined there was not sufficient evidence to submit the issue to the jury. *See Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013); *see also Nelson v. James H. Knight DDS, P.C.*, 834 N.W.2d 64, 73 (Iowa 2013) (finding a defendant's conduct did not amount to unlawful discrimination under the facts). "We can resolve a matter on summary judgment

if the record reveals a conflict concerning only the legal consequences of undisputed facts." *Boelman*, 826 N.W.2d at 501.

### III. Discussion.

On appeal, the plaintiffs challenge all of the grounds for summary judgment found by the district court in its ruling. However, we need only find one ground sustainable to uphold the ruling. *See Bartsch v. Bartsch*, 636 N.W.2d 3, 6 (Iowa 2001); *see also In re Estate of Voss*, 553 N.W.2d 878, 879 n. 1 (Iowa 1996); *Grefe & Sidney v. Watters*, 525 N.W.2d 821, 826 (Iowa 1994). Because we agree with the district court that summary judgment was proper because the plaintiffs lacked standing, we find that ground dispositive. Therefore, it is the only issue we will discuss.

Standing refers to "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right." Black's Law Dictionary 1413 (7th ed. 1999). If the party asserting a claim lacks standing, the court will not hear the claim, even if the legal controversy asserted could be meritorious. *See Alons v. Iowa Dist. Ct.*, 698 N.W.2d 858, 864 (Iowa 2005). Stated another way, "[w]hether litigants have standing does not depend on the legal merit of their claims, but rather whether, if the wrong alleged produces a legally cognizable injury, they are among those who have sustained it." *Citizens for Responsible Choices v. City of Shenandoah*, 686 N.W.2d 470, 475 (Iowa 2004). Consequently, when a standing issue is raised, our focus is on the party asserting the claim and not the merits of the party's claim. *See Alons*, 698 N.W.2d at 864.

Iowa's "standing inquiry has two distinct prongs, each of which a plaintiff must satisfy to proceed with a claim. Our cases have determined that a

complaining party must (1) have a specific personal or legal interest in the litigation and (2) be injuriously affected." *Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 452 (Iowa 2013) (citation and internal quotation marks omitted). "To satisfy the first element, we require the litigant to allege some type of injury different from the population in general. To satisfy the second element, the injury cannot be 'conjectural' or 'hypothetical,' but must be 'concrete' and 'actual or imminent.'" *Hawkeye Foodservice Distribution, Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 606 (Iowa 2012) (internal citations and quotation marks omitted).

The Iowa Supreme Court has further observed:

> While both Iowa and federal case law on the application of standing to public-interest litigation has largely focused on the type of factual injury required to support standing, federal law has also developed additional elements that are particularly applicable when the "asserted injury arises from government's allegedly unlawful regulation (or lack of regulation) of someone else," as opposed to cases in which the "plaintiff is himself an object of the action (or foregone action) at issue." *Lujan v. Defenders of Wildlife*, [504 U.S. 555, 561-62 (1992)]. Under such a circumstance, the plaintiff must establish "a causal connection between the injury and the conduct complained of" and that the injury is "'likely,' as opposed to merely 'speculative,' to be 'redressed by a favorable decision.'" [*Id.*]. These two additional considerations largely relate to the prudential concerns we have recognized, and we too have relied on them to resolve standing claims in the past. For example, in *Citizens for Responsible Choices*, we were presented with an action by a group of citizens who sought a declaration that a public-improvement project was illegal because the bonds to finance the project were allegedly issued in violation of the law. 686 N.W.2d at 472. The project included the construction of a recreational lake and park on land owned or rented by the citizens. *Id.* We held the citizens group had no standing to challenge the action in the issuance of the revenue bonds because the injury claimed came from the project itself, not the governmental action in the issuance of the bonds. *Id.* at 475. To borrow from the federal language, the injury was not "fairly traceable" to the challenged action. *Lujan*, [504 U.S. at 560].

*Godfrey v. State*, 752 N.W.2d 413, 421-22 (Iowa 2008); *see also Alons*, 698 N.W.2d at 867-68 (discussing the additional standing elements established by federal case law as discussed in *Lujan*).

In *Lujan*, the U.S. Supreme Court discussed the additional standing elements in relation to a motion for summary judgment. *See* 504 U.S. at 560-61. The Court noted that because the standing elements are "an indispensable part of [a] plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Although general factual allegations by the plaintiff of injury resulting from the defendant's conduct may suffice at the pleading stage, the plaintiff can no longer rest on mere allegations in response to a defendant's summary judgment motion. *See id.* Rather, the plaintiff "must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal citation and quotation marks omitted). "Standing is not an ingenious academic exercise in the conceivable, but as we have said requires, at the summary judgment stage, a factual showing of perceptible harm." *Id.* at 566 (internal citation and quotation marks omitted). The Court further noted that "standing is to be determined as of the commencement of suit." *Id.* at 571 n.5.

The plaintiffs acknowledge in their reply brief that the additional standing elements set forth in *Lujan*, as discussed in *Godfrey*, apply here. *See Godfrey*, 752 N.W.2d at 421-22; *see also Lujan*, 504 U.S. at 560-61. Additionally, the plaintiffs agree that standing is to be determined as of the commencement of

suit, as stated in *Lujan*.[3]  However, they maintain that they suffered an "injury-in-fact" because they have continued "to allege that the failure to implement the statutory change jeopardized [their] future benefits."  We disagree.

Here, when Brunkhorst filed suit, he was an inactive member of IPERS and was not making any contributions to the fund.  He pled in his original petition that the defendants' "failure to implement the statutory mandate . . . has contributed toward a need for increased and/or additional contributions from [Brunkhorst]."  The evidence, as consequently fleshed out in the summary judgment record, shows Brunkhorst had not paid any increased contribution rate at the time of the filing of his suit.  There is no evidence in the summary judgment record, but for his own belief, that his future IPERS benefits were in jeopardy.  The same applies for Lewis.  Although he was an active member and making contributions to IPERS at the time Brunkhorst filed suit, he was not, at that time, required to pay at an increased rate.  Again, there was no evidence presented, but for his own belief, that his future IPERS benefits were in jeopardy.  The plaintiffs have failed to present any evidence they suffered an actual injury in fact, and, thus, a legally cognizable injury.  Consequently, we agree with the district court's determination that there was not sufficient evidence of a genuine issue of material fact as to standing to submit the matter to the jury.

---

[3] Although our supreme court has not officially adopted this language and could choose to interpret our constitution differently, its prior adoption of language from *Lujan*, along with its general acceptance of similar parallel federal standing analysis, supports the conclusion our supreme court would agree.  *See Godfrey*, 752 N.W.2d at 418; *Alons*, 698 N.W.2d at 869.  Nevertheless, because the plaintiffs do not challenge the proposition, we do not address it any further.

Because we agree, for purposes of summary judgment, the plaintiffs failed to establish a genuine issue of material fact that they suffered an actual injury in fact and therefore a legally cognizable injury, we conclude the district court did not err in granting the defendants' motion for summary judgment. Accordingly, we affirm the ruling of the district court.

**AFFIRMED.**